Filed 1/21/16  Leseberg v. Fortune CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| YU LESEBERG, | B260877 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC554705) |
| v. | |
| WALLACE O. FORTUNE et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court for Los Angeles County, Kevin C. Brazile, Judge.  Affirmed.

Kinsella Weitzman Iser Kump & Aldisert, Howard Weitzman, Katherine T. Kleindienst and Jeremiah T. Reynolds for Defendants and Appellants.

Kendall Brill & Kelly, Alan Jay Weil and Nicholas F. Daum for Plaintiff and Respondent.

Defendants Wallace O. Fortune (Fortune) and Nigro Karlin Segal Feldstein & Bolno, LLC (Management Firm) (collectively, Managers) appeal from an order denying their special motion to strike the complaint filed by Yu Leseberg, a professional law corporation (Law Firm). The motion was brought under the so-called anti-SLAPP statute, Code of Civil Procedure section 425.16.[1] The trial court found that (1) Law Firm's complaint did not arise from conduct in furtherance of Managers' exercise of their right of free speech in connection with a public issue or an issue of public interest, and (2) in any event, Law Firm demonstrated a probability of prevailing on its complaint. We conclude that the conduct alleged in the complaint did not concern any public issue or issue of public interest, and therefore section 425.16 does not apply. Accordingly, we affirm the order.

## BACKGROUND

A.  *Allegations of the Complaint*

Law Firm's complaint alleges the following.

Law Firm is an entertainment and intellectual property law firm. Beginning in mid-2011, Law Firm, through its principal Helen Yu (Yu), represented a young performer named Dijon "DJ Mustard" McFarlane (Mustard). At the start of the representation, Mustard was performing at parties and small clubs in the south central area of Los Angeles. By the time the complaint was filed, he had become a prominent, nationally known record producer best known for producing several hit single records in the urban hip-hop genre.

---

[1]     Further undesignated statutory references are to the Code of Civil Procedure. "SLAPP" is an acronym for strategic lawsuit against public participation.

In late 2011, when Mustard was 21 years old, Law Firm and Mustard entered into a legal representation agreement. Law Firm agreed to represent Mustard as entertainment counsel in connection with Mustard's work as a songwriter, producer, recording performing artist, and DJ. In exchange for Law Firm's legal services, Mustard agreed to pay Law Firm 10 percent of his gross compensation earned by or paid to him for any of his agreements or engagements in the entertainment industry while he was represented by Law Firm. According to Law Firm, it is customary practice in the entertainment industry for an unestablished artist to compensate his or her attorneys by paying them a percentage (usually 10 percent) of the artist's gross compensation; once the artist becomes successful, the attorneys may agree to reduce the percentage to five percent.

Early in Law Firm's representation of Mustard, Mustard's compensation generally ranged from a few hundred dollars to a few thousand dollars, and rarely exceeded $30,000. Law Firm negotiated a series of lucrative agreements for Mustard in December 2011, January 2013, and April 2014; under the terms of the April 2014 agreement (with Songs Music Publishing [SMP]), Mustard was guaranteed to receive more than a million dollars.

In the fall of 2013, Law Firm referred Mustard to Management Firm for accounting and business management services. Management Firm assigned Mabel Tash to work with Mustard. In early-to-mid 2014, Law Firm negotiated on Mustard's behalf an agreement with Capital Records for two record joint venture label deals, and arranged for a "DJ artist live performance" agent to represent Mustard for the purpose of obtaining engagements for Mustard for DJ services related to electric dance music performances.

Upon the closing of the April 2014 agreement with SMP, Management Firm informed Law Firm that Fortune would be assigned to work with Mustard. Law Firm alleges on information and belief that in May 2014, almost immediately after

3

Fortune was assigned to Mustard, Fortune falsely informed Mustard that Law Firm was overcharging Mustard for its services, and that other entertainment law firms charged their clients a maximum of five percent, regardless of the clients' success. Around the same time, Law Firm and Mustard agreed to modify the representation agreement to reduce Law Firm's fee on artist deals and tours to five percent; they agreed that Law Firm's fee would remain at 10 percent for producer and publishing deals.

On June 5, 2014, Yu contacted Richard Feldstein, a principal of Management Firm, about Fortune's conduct with regard to Mustard and Law Firm. Feldstein told Yu in an email that "Mustard was the one who brought up the 10 percent. Jay Brown [Mustard's manager] was the one who brought up the money going thru you. [Fortune] tried to be supportive on both issues." Law Firm alleges on information and belief that Feldstein's representations were false. Law Firm alleges that Feldstein acknowledged in June 2014 that before Law Firm negotiated the multi-million dollar SMP deal in April 2014, it would not have been financially viable for an attorney to represent Mustard for a five percent fee. Law Firm also alleges that Fortune admitted in an email to Feldstein in June 2014 that he had, in fact, provided Mustard with the information that most entertainment law firms charge their clients only five percent.

In June 2014, Law Firm further modified the fee it charged Mustard. Under that modification, Law Firm would be entitled to five percent of Mustard's income regardless of source, except that Law Firm would be entitled to a minimum of 10 percent for any producer and publishing deals in which the compensation to Mustard was under $30,000. Yu called Fortune to inform him of the modified fee.

The following month, Yu discussed with Fortune her remittance of several checks to Mustard in care of Management Firm. She explained that each check was for compensation Mustard earned for services he had rendered as a record

4

producer for various artists, less Law Firm's fee. Each check was accompanied by a letter from Yu stating the amount that was deducted -- five percent or 10 percent -- depending upon whether the compensation for Mustard's services was above or below $30,000.

On July 29, 2014, Law Firm mailed to Mustard, in care of Management Firm, several checks and cover letters for compensation received by Mustard under various agreements. One of those checks was for royalties received from SoundExchange. The amount of the royalties was less than $2,000. In the accompanying cover letter, Yu stated that Law Firm had deducted its fee, equal to 10 percent, because the royalty payment was for an amount less than $30,000. On July 31, Fortune's assistant sent an email to Mustard, attaching the check disbursement and cover letter relating to the royalties from SoundExchange. In the text of the email, the assistant stated that Mustard was charged 10 percent by Law Firm for legal fees. She did not explain in her email the reason for the 10 percent, rather than five percent, fee. Law Firm alleges on information and belief that Management Firm knew or should have known that Mustard would likely read the email on his iPhone, and he likely would not and could not read any of the email's attachments on his iPhone.

On July 31, 2014, Law Firm advised Fortune in writing that although it had agreed to charge Mustard five percent on producer and publishing deals only for deals above $30,000, it now agreed to forego the $30,000 threshold and accept a five percent fee regardless of the size of the deal. The next day, Fortune sent Mustard an email stating Law Firm was charging him 10 percent for all producer and publishing deals, regardless of the amount of the deal. Almost immediately after receiving Fortune's email, Mustard terminated his relationship with Law Firm.

5

The complaint alleges four causes of action against Managers: intentional interference with contract, negligent interference with contract, intentional interference with prospective economic advantage, and negligent interference with prospective economic advantage. Each cause of action alleges that Managers "falsely informed and misled Mustard in at least the following ways concerning the [representation] Agreement [between Law Firm and Mustard]: [¶] (a) In or about May 2014, [Managers] falsely advised Mustard that [Law Firm] had been overcharging Mustard for [Law Firm's] services and that no other entertainment law firm charged clients more than 5%. [¶] (b) On or about July 31, 2014, [Managers] misled Mustard to believe that [Law Firm] was charging Mustard a 10% fee on all of Mustard's income regardless of the source or amount. [¶] (c) On or about August 1, 2014, [Managers] falsely advised Mustard that under the Agreement Mustard was obligated to pay [Law Firm] 10% of his income on all producer and publishing deals, regardless of amount." The complaint alleges that at the time Managers made those false statements they knew or should have known that the statements were false, that they intended to induce (or negligently caused) Mustard to terminate the representation agreement (or relationship) with Law Firm, and that as a result of the false statements Mustard terminated the representation agreement (or relationship).

B.    *Managers' Special Motion to Strike*

Managers filed a special motion to strike Law Firm's complaint. They argued that the complaint was subject to dismissal under section 425.16 because all of the causes of action arise from alleged statements made by Managers "in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) They asserted that "the crux of [Law

6

Firm's] complaint is that [Management Firm], and Fortune in particular, told Mustard that by charging a ten percent commission, [Law Firm] was charging a commission that was higher than the industry standard." They contended that those statements related to an issue of public interest because "[t]he public has a strong interest in the dissemination of opinions about customary fees charged by professionals for their services." In addition, they contended that "[t]he issue of business professionals -- like managers or attorneys -- taking advantage of their creative clients has been a matter of public concern and discussion for decades," especially where, as here, the client has achieved fame and success. In support of their assertion that the issue of managers or attorneys taking advantage of their clients has been a matter of public concern and discussion, Managers submitted published articles on the topic, including an interview with Yu published in an entertainment industry magazine purportedly addressing that topic.[2]

Managers also argued that Law Firm cannot establish a probability of prevailing on its claims because (1) the alleged conduct did not cause Mustard to terminate his relationship with Law Firm; (2) the alleged conduct was not independently wrongful; (3) Law Firm cannot establish that Managers acted with the intent to interfere with or disrupt Law Firm's relationship with Mustard or knew that the interference was substantially certain to occur; and (4) Managers' conduct was justified by the adviser's privilege. Managers supported these arguments with declarations from Mustard and Fortune discussing the

---

[2]    We cannot confirm the content of that interview because the copy of the interview that is included in the joint appendix on appeal is for the most part illegible. We assume that Managers have correctly summarized the content, inasmuch as Law Firm does not contest their representations regarding it. Although we caution counsel to review the documents that are included in the record to ensure they can be read before they file the record with this court, our inability to read the content in this instance does not affect our analysis here.

7

communications at issue and Mustard's decision to terminate his relationship with Law Firm.

The trial court denied the motion on the grounds that Managers did not establish that section 425.16 applied, and even if they had, Law Firm established a probability of prevailing on the merits. Managers timely filed a notice of appeal from the trial court's order denying the motion.

# DISCUSSION

A. *Section 425.16 and the Standard of Review*

Section 425.16 was enacted "to provide a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055-1056.) Its purpose "'is to encourage participation in matters of public significance and prevent meritless litigation designed to chill the exercise of First Amendment rights. (§ 425.16, subd. (a).) The Legislature has declared that the statute must be "construed broadly" to that end. (*Ibid.*)' [Citation.]" (*Albanese v. Menounos* (2013) 218 Cal.App.4th 923, 928 (*Albanese*).)

The statute provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The statute provides that an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by

8

law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

"'Section 425.16 requires that a court engage in a two-step process when determining whether a defendant's anti-SLAPP motion should be granted. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity. [Citation.] If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.'" (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 477.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute -- i.e., that arises from protected speech or petitioning *and* lacks even minimal merit -- is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.) Thus, if the defendant fails to satisfy the first step, the court need not address whether the plaintiff has demonstrated a probability of prevailing; the court must deny the special motion to strike. On appeal, our review of an order denying a special motion to strike is de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.)

B.   *Application of Section 425.16*

Managers contend that Law Firm's claims arise from statements made by Managers that qualify as protected conduct under subdivision (e)(4) of section 425.16, that is, it was "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a

9

public issue or an issue of public interest." They assert that each of the claims arises, at least in part, from Managers' statement to Mustard that Law Firm's 10 percent fee exceeded the customary fee charged in the industry. They argue that that statement was made in connection with an issue of public interest because (1) the public has an interest in access to advice and information regarding professional services; (2) the public has a strong interest in business managers providing uncensored advice regarding their clients' business affairs; (3) the public has an interest in the financial concerns of famous artists; and (4) Law Firm's fees are a matter of public interest because Law Firm has promoted itself as an advocate for artists. We disagree.

While it may be true that the public has an interest in these issues in the abstract, the statements at issue in Law Firm's complaint were not directed to these amorphous public interests. As one court observed, "[t]he fact that 'a broad and amorphous public interest' can be connected to a specific dispute is not sufficient to meet the statutory requirements" of section 425.16. (*Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280; accord, *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1570.) Instead, "the focus of the anti-SLAPP statute must be on the specific nature of the speech rather than on generalities that might be abstracted from it." (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 111 (*Mann*).)

In this case, the statement Managers contend invokes section 425.16 concerned a private fee arrangement between Mustard and Law Firm. The fact that Managers allegedly referred to the customary fee that other entertainment law firms charged their clients when advising Mustard that Law Firm was overcharging him does not render that statement one concerning a matter of public interest. To fall within section 425.16, subdivision (e)(4), "the focus of the speaker's conduct should be the public interest, not a private controversy." (*Hailstone v. Martinez*

10

(2008) 169 Cal.App.4th 728, 736; accord, *Albanese, supra,* 218 Cal.App.4th at p. 936; see also *Mann*, *supra*, 120 Cal.App.4th at p. 111 [defendants' alleged statements that plaintiffs were unlawfully dumping toxic chemicals did not concern a matter of public interest; "defendants' alleged statements were not about pollution or potential public health and safety issues in general, but about [plaintiffs'] specific business practices"]; *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 601 [statements in advertisement that an herbal supplement promotes breast enlargement did not involve a issue of public interest because those statements were not about "herbal supplements in general," but instead were about "the specific properties and efficacy of a particular product"].)

Here, the focus of Managers' statement was not an issue of public concern, i.e., the customary fees charged by entertainment law firms. Rather, the focus of Managers' statement was an issue of concern only to Mustard (and, perhaps, Managers), i.e., whether Law Firm was overcharging Mustard for legal services. For this reason, the cases Managers cite are inapposite, because the focus of the conduct at issue in those cases was to provide public warnings to consumers regarding the plaintiffs' trustworthiness. (See *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 889-890 [defendant, an expert on viatical settlements, maintained a website that included statements warning consumers that plaintiffs (life insurance brokers) were unethical, incompetent, and under investigation by the California Department of Insurance]; *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1141-1142, 1146 [defendants posted statements about trustworthiness of plaintiff, who ran a forensics business, on a website on which members of could comment on the reliability and honesty of various providers of goods and services]; *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 332-342 [defendants, a newspaper and its reporters, wrote an article warning consumers about doctors, and specifically

11

plaintiff, who market their services by claiming to treat famous sports figures; the article quoted two professional athletes, also defendants, who denied having been treated by plaintiff and called plaintiff a liar]; *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.* (N.D.Cal. 2013) 946 F.Supp.2d 957, 965-966 [defendants, a brokerage firm, its president, and a former employee, conducted an online "smear campaign" on several consumer-report websites against plaintiffs, a real estate investment firm and its sole shareholder, accusing plaintiffs of engaging in dishonest, fraudulent, and potentially criminal business practices].)

Simply put, Managers' personal, and private, business advice is not the kind of public consumer protection warning that is protected under the anti-SLAPP statute. Nor does the statute protect Managers' business advice because that advice was given to a famous person. Mustard's fame does not turn a private controversy -- whether Law Firm overcharged him -- into a public issue. As we observed in *Albanese*, without evidence of a *public* controversy concerning the subject matter of the statements at issue, the participants' fame alone is insufficient to satisfy the "public issue" requirement of section 425.16, subdivision (e)(4). (*Albanese*, *supra*, 218 Cal.App.4th at p. 936.)

Similarly, the fact that Yu previously gave an interview in which she spoke of the exploitation of artists by their business managers or lawyers does not mean that this private dispute over whether Law Firm overcharged Mustard can be considered an issue of public interest in the absence of any evidence that the public has any knowledge of -- let alone interest in -- the financial relationship between Mustard and Law Firm. Managers assert, however, that Law Firm's fees are a matter of public interest because Law Firm "injected itself" into the public debate on the issue of the exploitation of artists. (Citing *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226 (*Sipple*); *Seelig v. Infinity Broadcasting Corp.*

12

(2002) 97 Cal.App.4th 798 (*Seelig*); and *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13 (*Gilbert*).)  Those cases are distinguishable.

For example, in *Sipple*, the plaintiff was a nationally known political consultant who developed themes for his clients that included the prevention and punishment of domestic violence and other crimes against women.  The defendants published an article about a custody dispute between plaintiff and his first wife, in which plaintiff's first and second wives testified that the plaintiff had physically and verbally abused them.  The article also included statements from interviews of others with knowledge of the alleged abuse.  (*Sipple*, *supra*, 71 Cal.App.4th at p. 230.)  The court found that plaintiff's treatment of his previous wives was a public issue because the custody dispute was a judicial proceeding authorized by law.  (*Id.* at pp. 237-238.)  As to statements in the article that came from information that was not part of the custody hearing, the court found that those statements concerned a public issue because the record showed that the plaintiff was "a top figure in national politics, [who had] been interviewed by the press and profiled in the media scores of times [and had] devised media strategy based on gender-based advertising against domestic violence for [three] gubernatorial races."  (*Id.* at p. 238.)  The court observed that "the issues of spousal abuse generated in the custody proceedings are of public interest when the person accused of the abuse is a nationally known figure identified with morality campaigns for national leaders." (*Id.* at p. 239.)  The court concluded "that the details of [the plaintiff's] career and [the plaintiff's] ability to capitalize on domestic violence issues in his advertising campaigns for politicians known around the world, while allegedly committing violence against his former wives, are public issues."  (*Id.* at pp. 239-240.)

In contrast, in this case the evidence is that Yu gave a single interview, published in July 2012, in which she discussed "how artists can avoid getting ripped off by their own managers."  That single interview is insufficient to show

13

that she is a nationally known figure identified with campaigns to prevent the exploitation of artists such that Law Firm's alleged overcharging of Mustard is a matter of public interest.

In *Seelig*, the plaintiff was a contestant in a reality show; the defendants were a radio broadcaster, and talk-radio co-hosts and their on-air producer, who made insulting comments about the plaintiff on their show. In finding that the offending comments concerned a matter of public interest, the appellate court noted that the reality show "generated considerable debate within the media on what its advent signified about the condition of American society," and that one concern focused on the sort of person who was willing to appear on the show in exchange for the notoriety and financial rewards associated with the show. (*Seelig*, *supra*, 97 Cal.App.4th at p. 807.) The court concluded that "[b]y having chosen to participate as a contestant in the Show, plaintiff voluntarily subjected herself to inevitable scrutiny and potential ridicule by the public and the media." (*Id.* at p. 808.)

In this case, there is no evidence that the interview with Yu was the subject of any public debate such that it can be said that Law Firm voluntarily subjected itself to inevitable scrutiny of its fee agreements.

Finally, *Gilbert* does not support Managers' assertion. In that case, the cross-complainant was a prominent professor and practitioner of plastic and reconstructive surgery who performed a series of facial cosmetic procedures on the cross-defendant. Unhappy with the results, the cross-defendant sued the cross-complainant for medical malpractice and created a website relating her experiences with the cross-complainant and providing information about plastic surgery generally. The cross-complainant filed a cross-complaint for defamation against the cross-defendant, and the cross-defendant filed a special motion to strike the cross-complaint. (*Gilbert*, *supra*, 147 Cal.App.4th at pp. 17-18.) Although

14

Managers correctly note that the appellate court stated that the cross-complainant "thrust himself into [the debate over plastic surgery] by appearing on local television shows as well as writing numerous articles . . . touting the virtues of cosmetic and reconstructive surgery" (quoting *id.* at p. 25), those statements by the court had nothing to do with the court's holding that the claims at issue arose from the cross-defendant's exercise of free speech on a public issue. Instead, the court's statements related to the cross-complainant's probability of prevailing on his defamation claim. (See *id.* at p. 24 ["The most important question we face is whether Sykes was a limited purpose public figure for purposes of his defamation claims"].)

To conclude, Managers failed to establish that Law Firm's complaint arises from an act by Managers in furtherance of their right of petition or free speech under section 425.16. Therefore, the statute does not apply, and the trial court properly denied Managers' special motion to strike.

C.     *Law Firm's Request for Attorney Fees*

In its opposition to Managers' special motion to strike, Law Firm requested that the trial court award it attorney fees on the ground that Managers' motion was frivolous and intended to cause unnecessary delay. The trial court denied the request for fees at the hearing on the motion, although the court's minute order does not reflect this ruling. Law Firm did not file an appeal from the denial of attorney fees, but it argues in its respondent's brief that the trial court abused its discretion in denying it attorney fees, and asks this court to award it attorney fees incurred at the trial level and on appeal.

An order denying a request for attorney fees is an appealable order. In the absence of a notice of appeal from the order denying attorney fees, this court has no jurisdiction to consider Law Firm's request with respect to the fees incurred at

15

the trial court level. (See *Drell v. Cohen* (2014) 232 Cal.App.4th 24, 31.) As for the fees incurred in this appeal, while we find the appeal has no merit, we are not persuaded that is enough for us to declare it to be frivolous or brought solely for the purpose of delay. Therefore, we decline to award attorney fees on appeal.

## DISPOSITION

The order is affirmed. Law Firm shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.

16