[No. A094062. First Dist., Div. Five. Apr. 16, 2002.]

JENNIFER SEELIG, Plaintiff and Respondent, v.
INFINITY BROADCASTING CORPORATION et al., Defendants and
Appellants.

**COUNSEL**

Davis Wright Tremaine, Frederick F. Mumm, Susan Seager and Thomas R. Burke for Defendants and Appellants.

The Dolan Law Firm, Christopher B. Dolan and Mark L. Weber for Plaintiff and Respondent.

**OPINION**

**SIMONS, J.**—Reality television and talk radio are two of the more popular cultural phenomena of the new century. In the first, real people often

compete for a prize under the most unrealistic, often demeaning conditions. In the second, a host discusses topics of current interest with live guests and call-in audience members. These discussions often, though not always, include generous portions of insult and invective. Given these programming themes, it was inevitable that a participant in a reality television competition would be insulted by a talk-radio host and sue for defamation.

The instant appeal involves such a suit. Defendants Infinity Broadcasting Corporation, Uzette Salazar, Vincent Crackhorn and Steve Dinardo filed a special motion to strike plaintiff's complaint and asserted that the suit constituted a SLAPP (strategic lawsuit against public participation) suit pursuant to Code of Civil Procedure section 425.16 (hereafter section 425.16). The trial court denied the motion. We conclude that the challenged commentary was made "in connection with an issue of public interest" (§ 425.16, subd. (e)(3) & (4)), even though much of it concerned plaintiff's unwillingness to appear on the radio program. Further, we determine that the insults uttered are not actionable under section 425.16 and reverse the order of the trial court.

## BACKGROUND[1]

Plaintiff participated as one of 50 contestants in the television program *Who Wants to Marry a Multimillionaire* (Fox Network, Feb. 15, 2000) (hereafter the Show). In this program, women contestants competed for the right to marry a wealthy stranger. In addition to the marriage, complete with a prenuptial agreement, the bride received a $35,000 wedding ring and a new car. Plaintiff was not chosen to marry the putative multimillionaire, nor even selected as one of the five finalists, though she did appear briefly as a contestant in a portion of the television broadcast. During her time on air, she stated only her name, that she was from San Francisco, and that she worked in sales at KFRC,[2] a San Francisco radio station. Her total participation in the television broadcast lasted less than one minute. Though plaintiff was not paid for her participation in the Show, she received the cost of the trip to Las Vegas and some gifts.

The taping of the Show occurred before its airing on February 15, 2000, with all taping involving plaintiff being completed prior to February 1, 2000. To plaintiff's knowledge, her name and likeness were neither aired nor made public in any way by the producers of the Show before the television broadcast.

---

[1]The facts are derived from the pleadings and affidavits of the parties.

[2]KFRC is a division of defendant Infinity Broadcasting Corporation (Infinity), which also owns radio station KLLC.

Defendant Uzette Salazar (Uzette) contacted plaintiff on or about February 1, 2000, and asked if she would participate in a discussion regarding the Show on KLLC's "Sarah and Vinnie" morning radio program. Plaintiff declined. She informed Uzette that she competed in the contest only as a personal experience, and that she did not wish to be interviewed on their radio program because she did not want to bring attention to herself or to chance being ridiculed or subjected to public humiliation. She also told Uzette that she was contractually prohibited from entering into any type of publicity concerning the Show.

On February 15, 2000, during the radio program, but before the Show was televised, the following colloquy occurred between Sarah Clark (Sarah)[3] and Vincent Crackhorn (Vinnie), KLLC's morning broadcast cohosts, along with Uzette, the radio program's on-air producer:

"Vinnie: . . . and what is this, the *Marry A Millionaire* show?

"Sarah: *Who Wants to Marry a Millionaire*?

"Vinnie: Right.

"Sarah: It's on tonight. Two hour long thing. Fifty chicks are gonna fight it out for the top five spots and then they all put on uh wedding gowns and somebody gets married at the end.

"Vinnie: Right. And we have uh, a local loser on the, on the prog—

"Sarah: m, uh hum—

"Vinnie: from what I heard.

"Uzette: (Laughter.)

"Vinnie: Now uh, this is, this is crackin me up because I'm not, and I'm not saying any names—

"Uzette: I know.

"Vinnie: Whatever.

"Uzette: Go ahead.

"Vinnie: But uh, this person apparently we were gonna have her on the show to see what her bucket's all about, why she wants to marry some random guy—

---

[3]Plaintiff did not name Sarah in the complaint as an individually named defendant.

"Sarah: Right.

"Vinnie: and she wouldn't come on without like, what—you tell me.

"Uzette: She wanted like some written consent that we weren't going to bag on her, and uh, she, she's just not, I don't think she's a real fan.

"Vinnie: Chicken butt!

"Uzette: She actually works at another station—

"Sarah: Oh really!

"Vinnie: Chicken butt!

"Uzette: and I found out more dirt about this girl, since we're not saying her name. She actually is the ex-wife of someone who works at our sister station down the hall. And uh yeh, he just says what a big skank she is.

"(Laughter.)

"Sarah: You can't say that! That, that is so ridiculous.

"(Laughter.)

"Sarah: You know what you guys, don't say any more because, ya know, because the person who's on that show, and people are going to be able to figure out who it is. You can't be calling people skank.

"Vinnie: No way.

"Sarah: Were you at that legal—PLEASE! You just gave all the clues anyone would ever need. I could figure it out and I am stupid.

"Uzette: Anyway, it is coming from a jilted ex-husband. What does he know.

"Sarah: Exactly Uzette.

"Vinnie: Right.

"Sarah: We were all in that same legal meeting. Ah, kill me!

"(Laughter.)

"Uzette: I think I covered my tracks.

"(Laughter.)

"Uzette: Boss?

"(Laughter.)

"Sarah: I hope so.

"Uzette: Please don't fire me now.

"Sarah: Oh God.

"Vinnie: Funny.

"Uzette: I am sure she's a very nice girl.

"Sarah: Right.

"Uzette: I don't, I don't think she won though.

"Sarah: Well right. If she did win I am sure she would be off on her honeymoon and not available for us to pick on.

"Vinnie: I just think it's so funny. A total chicken butt. Wanted to, you know it's like—

"Uzette: We rag, we rag on each other.

"Vinnie: stand up for yourself if—

"Sarah: Right.

"Vinnie: if you wanted to go on the show.

"Sarah: Tell us why, that is the whole thing.

"Vinnie: Yeah, state your, state your reasons.

"Sarah: So, you like money? We like it too. That's fine.

"Vinnie: Besides, all ya gotta do is tell me to shut up and walk away. What big deal.

"Sarah: Right.

"Vinnie: So that's so traumatic. Never heard anything like that in my life. Sign a freakin waiver so you won't call me names. Whatever. Anyway—

"Sarah: She's obviously in the business. Most people just come on and go whatever, what do you want to know. Oops.

"Uzette: And then they are sorry for it.

"(Laughter.)

"Vinnie: Anyway, the guy gets, tonight's the special. It was taped last week in Vegas. And it does feature a wedding. And the bride is unidentified at this point.

"Sarah: I can't, I ought, I think I am gonna watch this.

"Vinnie: And this guy and his new wife are currently on their honeymoon.

"Sarah: Good for them.

"Vinnie: Unbelievable.

"Sarah: I'm telling you. I think this is going to be a really fun thing to watch. Does he get to see their faces, and watch the whole thing as it happens?

"Vinnie: Hold on, let me see.

"Sarah: Or is he also in the dark like the old dating game. Where you had to ask just the questions and—cuz I know they don't get to see him.

"Vinnie: Um, doesn't say.

"Sarah: Alright. Well, two hours, it's on tonight. Jay Thomas is the host of it.

"Vinnie: Yeah, that's—that doesn't say the details. Yup."[4]

After the radio program, but before the airing of the Show, plaintiff received numerous telephone calls from individuals, business associates, and

---

[4]Without opposition, defendants provided the trial court with an audiotape of this radio broadcast (attached as exhibit B to the declaration of Uzette in support of defendants' motion to strike); however, defendants did not provide the trial court with a transcription of that tape. In her opposition papers, plaintiff, in turn, provided the trial court with a transcription of that

personal friends, stating that they were aware she had been humiliated on the broadcast. Plaintiff became extremely upset and angry with her ex-husband because she thought he had made the statements about her until he assured her he had not. Plaintiff's ex-husband was never asked if he thought plaintiff was a "skank" and he never stated to anyone connected with KLLC that his ex-wife was a skank. The statement Uzette attributed to him was false, and Uzette later apologized to him for stating he had called plaintiff a big skank.

As a result of the radio broadcast, plaintiff filed a complaint against defendants alleging causes of action for: (1) slander per se; (2) slander; (3) invasion of privacy; (4) negligent hiring, retention and supervision of employees; (5) and intentional infliction of emotional distress. The trial court sustained demurrers to the causes of action for slander and intentional infliction of emotional distress, without leave to amend, because they were duplicative of other claims within the complaint. This appeal follows defendants' unsuccessful concurrent motion to strike the complaint pursuant to section 425.16, subdivision (b).

## DISCUSSION

### I. Overview of California's Anti-SLAPP Statute

In 1992, the Legislature enacted section 425.16 in an effort to curtail lawsuits brought primarily "to chill the valid exercise of . . . freedom of speech and petition for redress of grievances" and "to encourage continued participation in matters of public significance." (§ 425.16, subd. (a).) The section authorizes a special motion to strike "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b)(1).) The goal is to eliminate meritless or retaliatory litigation at an early stage of the proceedings. (*Liu v. Moore* (1999) 69 Cal.App.4th 745, 750 [81 Cal.Rptr.2d 807]; *Macias v. Hartwell* (1997) 55 Cal.App.4th 669, 672 [64 Cal.Rptr.2d 222].) The statute directs the trial court to grant the special motion to strike "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

The statutory language establishes a two-part test. First, we determine whether plaintiff's causes of action arose from acts by defendants in furtherance of defendants' rights of petition or free speech in connection with a

---

broadcast which, upon our review, appears to differ from the colloquy heard on the audiotape in minor respects unrelated to any of the phrases at the center of this dispute. In the interests of accuracy, this court has transcribed the audiotape in its entirely.

public issue. (*Mission Oaks Ranch, Ltd. v. County of Santa Barbara* (1998) 65 Cal.App.4th 713, 721 [77 Cal.Rptr.2d 1], disapproved on another ground in *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123, fn. 10 [81 Cal.Rptr.2d 471, 969 P.2d 564].) Assuming this threshold condition is satisfied, we then determine whether plaintiff has established a reasonable probability that she will prevail on her claims at trial. We must reverse the order denying the motion if plaintiff failed to make a prima facie showing in the trial court of facts, which, if proved at trial, would support a judgment in her favor. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 646, 653 [49 Cal.Rptr.2d 620].) Whether section 425.16 applies and whether the plaintiff has shown a probability of prevailing are legal questions which we review independently on appeal. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999 [113 Cal.Rptr.2d 625]; *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 474 [102 Cal.Rptr.2d 205].)

II. *Plaintiff's Complaint Falls Within the Purview of the Anti-SLAPP Statute*

To prevail on their motion to strike, defendants must make a threshold showing that they were sued for engaging in conduct covered by section 425.16. Under the statutory language, such a threshold showing can be established in several circumstances, including if the party seeking the protection of the section demonstrates that it made the offending statement "in a place open to the public or a public forum in connection with an issue of public interest." (§ 425.16, subd. (e)(3).)

Defendants have satisfied this standard. The offending comments arose in the context of an on-air discussion between the talk-radio cohosts and their on-air producer about a television show of significant interest to the public and the media. This program was a derivative of *Who Wants to Be a Millionaire,* which had proven successful in generating viewership and advertising revenue. Before and after its network broadcast, *Who Wants to Marry a Multimillionaire* generated considerable debate within the media on what its advent signified about the condition of American society.[5] One concern focused on the sort of person willing to meet and marry a complete

[5]Renewing requests that they made to the trial court, defendants ask this court to take judicial notice of news articles discussing the Show published before and after its airing on network television. (Evid. Code, §§ 452, subd. (h), 453, 459, subd. (a).) The news articles were furnished to the trial court, but the trial court never made an explicit ruling on the requests when it acted on the motion to strike. We grant the request, exercising our discretion to judicially notice matters that were subject to discretionary judicial notice by the trial court. (Evid. Code, §§ 452, subd. (h), 459, subd. (a); *Larson v. State Personnel Bd.* (1994) 28 Cal.App.4th 265, 270, fn. 2 [33 Cal.Rptr.2d 412].) Without assuming the truth of the

stranger on national television in exchange for the notoriety and financial rewards associated with the Show and the presumed millionaire lifestyle to be furnished by the groom. By having chosen to participate as a contestant in the Show, plaintiff voluntarily subjected herself to inevitable scrutiny and potential ridicule by the public and the media.

Plaintiff argues that the offending comments by defendants were not directed at her *participation* in the television contest, but instead were directed at her *refusal to participate* in the radio program. The distinction is unpersuasive. To satisfy the first threshold requirement, the offending comments must have been made "in connection with an issue of public interest." (§ 425.16, subd. (e)(3).) Furthermore, this requirement, like all of section 425.16, is to be "construed broadly" so as to encourage participation by all segments of our society in vigorous public debate related to issues of public interest. (§ 425.16, subd. (a); see *Averill v. Superior Court* (1996) 42 Cal.App.4th 1170, 1175-1176 [50 Cal.Rptr.2d 62] [§ 425.16, subd. (e) intended to be given broad application in light of its purposes].)

The topic under discussion on the radio program was plaintiff's appearance on the Show, and "why she wants to marry some random guy." Indeed, it is evident that defendants talked about plaintiff only because she had participated in the Show. Disparaging her refusal to appear on the radio program ("Stand up for yourself . . . if you wanted to go on the [Show]. Tell us why, that is the whole thing. Yeah, state your, state your reasons.") was indistinguishable from criticizing her participation in the televised contest. It was, in effect, the radio variant of the "empty chair" scenario, which is occasionally played out live or on television: a participant in an issue of public controversy declines to appear at a forum to discuss the matter and the host sets a place at the table, an empty chair, to emphasize that the absence underlines the flaw in the party's position.[6] Thus, criticism of the refusal to defend her participation in the contest satisfies the requirement of being "in connection with an issue of public interest." (§ 425.16, subd. (e)(3).)

### III. *It Is Unlikely Plaintiff Will Prevail on Her Claim*

With defendants having established a prima facie case that they were sued after exercising their First Amendment right to speech in a public

assertions contained in the news articles, the fact that news articles discussing topics provoked by the Show were published is not reasonably subject to dispute. (Evid. Code, § 452, subd. (h).)

[6]In his political dictionary, William Safire defines "empty chair" as "a phrase dramatizing an opponent's refusal to debate. [¶] When John Foster Dulles ran unsuccessfully against incumbent New York Senator Herbert Lehman, he was unable to draw Lehman into debate. To make his point, Dulles traveled with a 'prop'—an empty chair he debated in lieu of Lehman." (Safire's New Political Dict. (1993) p. 216.)

forum in connection with an issue of public interest, the burden then shifts to plaintiff to establish there is a probability that she will prevail on her claims. (§ 425.16, subd. (b)(1); *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1496 [45 Cal.Rptr.2d 624].) To meet this burden, plaintiff must "demonstrate the complaint is legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823 [33 Cal.Rptr.2d 446].) "The burden on the plaintiff is similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment. [Citations.]" (*Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907 [84 Cal.Rptr.2d 303].) To make our determination, we consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) The motion to strike should be granted if, as a matter of law, "the properly pleaded facts do not support a claim for relief. [Citation.]" (*Mission Oaks Ranch, Ltd. v. County of Santa Barbara, supra*, 65 Cal.App.4th at p. 721.)

 There can be no recovery for defamation without a falsehood. (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 259 [228 Cal.Rptr. 206, 721 P.2d 87].) Thus, to state a defamation claim that survives a First Amendment challenge, plaintiff must present evidence of a statement of fact that is provably false. (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 20 [110 S.Ct. 2695, 2706-2707, 111 L.Ed.2d 1].) "Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot ' "reasonably [be] interpreted as stating actual facts" about an individual.' [Citations.] Thus, 'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of . . . contempt,' and language used 'in a loose, figurative sense' have all been accorded constitutional protection. [Citations.]" (*Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1401 [88 Cal.Rptr.2d 843].) The dispositive question after the *Milkovich* case is whether a reasonable trier of fact could conclude that the published statements imply a provably false factual assertion. (*Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 724 [275 Cal.Rptr. 494].)

To ascertain whether the statements in question are provably false factual assertions, courts consider the " 'totality of the circumstances.' " (*Rudnick v. McMillan* (1994) 25 Cal.App.4th 1183, 1191 [31 Cal.Rptr.2d 193].) " 'First, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered. . . . [¶] This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to

whom the publication was directed.'" (*Moyer v. Amador Valley J. Union High School Dist.*, *supra*, 225 Cal.App.3d at p. 724, quoting *Baker v. Los Angeles Herald Examiner*, *supra*, 42 Cal.3d at pp. 260-261.) This crucial question of whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court. (*Moyer v. Amador Valley J. Union High School Dist.*, *supra*, at p. 724, citing *Baker v. Los Angeles Herald Examiner*, *supra*, at p. 260.)

Here, plaintiff complains about several derogatory comments made concerning her on the radio broadcast. Vinnie referred to plaintiff once as a "local loser" and three times as a "chicken butt," while Uzette falsely claimed that plaintiff's ex-husband had said she was a "big skank." A few seconds later, Uzette qualified her remark by noting that her source had been a "jilted ex-husband, [and w]hat does he know." Thus, the key question before this court is whether these statements, examined in context, can reasonably be understood to state actual facts about plaintiff that are provably false. We conclude that none of the statements constitute actionable statements of fact.

The comments local loser and chicken butt are not actionable because they were unquestionably statements of the speaker's subjective judgment. They fall into the realm of "classic rhetorical hyperbole which 'cannot "reasonably [be] interpreted as stating actual facts."'" (*Ferlauto v. Hamsher*, *supra*, 74 Cal.App.4th at p. 1404, quoting *Milkovich v. Lorain Journal Co.*, *supra*, 497 U.S. at p. 20 [110 S.Ct. at p. 2706].) We find them indistinguishable in nature from phrases such as "'creepazoid attorney'" and "'loser wannabe lawyer,'" which were found to be rhetorical hyperbole in the *Ferlauto* case. Although sophomoric and in bad taste, the comments are just the type of "name-calling of the 'sticks and stones will break my bones' variety" that the court in *Ferlauto* found to be not actionable as a matter of law. (*Ferlauto v. Hamsher*, *supra*, at p. 1404.) The chicken butt remark was plainly a derogatory figure of speech intended to convey Vinnie's subjective belief, stated in a nonserious manner, that plaintiff was afraid to appear on defendants' radio program for fear of being ridiculed; the term could not have been meant for the listeners to take literally because its literal interpretation is nonsensical when applied to a human being.

In addition, the terms local loser and chicken butt are not actionable because they are too vague to be capable of being proven true or false. Loser is a description applied to persons in many contexts that bears no potential defamatory inference, particularly if, like plaintiff in this case, the person

was unsuccessful in some contest. Likewise, chicken butt has no generally accepted meaning of an actionable nature. Referring to someone as a loser or a chicken butt is more appropriately characterized as a school yard taunt than an actionable defamation.

The phrase big skank is not actionable because it is too vague to be capable of being proven true or false. Attributing the comment to a specific source, plaintiff's ex-husband, does not alter that conclusion. The word skank is a derogatory slang term of recent vintage that has no generally recognized meaning. Like " 'creepazoid attorney,' " it is a "subjective expression[] of disapproval, devoid of any factual content." (*Ferlauto v. Hamsher, supra,* 74 Cal.App.4th at p. 1404; *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 838 [52 Cal.Rptr.2d 831].) Indeed, plaintiff provided no accepted dictionary definition for the term skank to the trial court and, instead, only proffered a declaration from her ex-husband stating his understanding of the term skank as referring to "a woman of loose morals." Plaintiff has cited no reported decision in California or elsewhere that has held the term skank constitutes actionable defamation, nor has our own research revealed any such decision.

Furthermore, when considered in the context of defendants' entire radio broadcast, the term skank constitutes rhetorical hyperbole which no listener could reasonably have interpreted to be a statement of actual fact. The irreverence of the Sarah and Vinnie morning radio program, which may strike some as humorous and others as gratuitously disparaging, is not atypical of this genre. (*Hobbs v. Imus* (1999) 266 A.D.2d 36 [698 N.Y.S.2d 25]; *Wilson v. Grant* (1996) 297 N.J.Super. 128 [687 A.2d 1009.) Listening to the tape of the radio broadcast confirms the nonserious nature of the discussion apparent from the written transcript. The colloquy comes across as light banter between the participants, frequently punctuated by laughter, concerning the Show and plaintiff's unwillingness to be interviewed on defendants' radio program without receiving written assurance that defendants would not "bag on her." The skank remark, the ensuing colloquy chiding Uzette for having made the remark, and Uzette's efforts to assuage it by noting the source had been a "jilted ex-husband,"[7] are presented in such a way that no reasonable listener would take them as factual pronouncements. (See *Hobbs v. Imus, supra,* at p. 26.)

---

[7]Plaintiff overreaches by contending that the term "jilted" indicates that plaintiff "dumped her husband as part of an infidelity or extramarital affair." The verb jilt has a much less inflammatory meaning according to Merriam-Webster's, which defines jilt as: "to drop (a lover) capriciously or unfeelingly." (Webster's 10th Collegiate Dict. (2000) p. 629.) In addition, as with the other comments, this one was made in a manner demonstrating it was meant to be humorous banter, rather than factual.

Finally, plaintiff contends that the *attribution* of the skank comment to her ex-husband was not a statement of opinion and was actionable under *Selleck v. Globe International, Inc.* (1985) 166 Cal.App.3d 1123 [212 Cal.Rptr. 838]. In *Selleck*, a newspaper stated that the father of Tom Selleck, the famous actor, had provided an interview in which he discussed his son's love secrets. The father sued, alleging he had never given the interview. The trial court dismissed the libel cause of action, but the Court of Appeal reversed, holding that the statement that an interview had been given was an assertion of fact, not an expression of opinion. (*Id.* at p. 1133.) The court noted: "One reading the article in question reasonably could conclude that [the father] violated the confidence reposed in him by his son by revealing the son's secrets for dissemination to the public. . . . The article . . . is subject to the further inference that [the father] was paid to divulge his son's secrets to [the newspaper], imputing to [the father] a Judas-like betrayal of his son." (*Id.* at p. 1132.) Even if we agree with plaintiff that attributing a quote to her ex-husband would reasonably be understood by the audience as an assertion of fact, rather than further irreverent hyperbole, her reliance on *Selleck* is misplaced. The party damaged in that case was the one quoted, not the subject of the quote. Though the *Selleck* decision may support the existence of a right by plaintiff's ex-husband to sue for a false quote attributed to him, it supports no such right for plaintiff.

In summary, we conclude that none of the comments regarding plaintiff are actionable, because no finder of fact could reasonably interpret the comments as stating provable facts about her. As such, the motion to strike should have been granted. Since all of plaintiff's causes of action arise from and depend upon her claims of defamation, the motion to strike should have been granted as to her entire complaint.[8]

## DISPOSITION

The order denying the motion to strike is reversed. The trial court is directed to enter a new and different order striking plaintiff's complaint in its entirety and an order awarding defendants their attorney fees and costs.

---

[8]Defendants' remaining requests for judicial notice are denied because the items requested for judicial notice are not directly relevant to the issues we find dispositive in this case. (*Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 962, fn. 1 [81 Cal.Rptr.2d 93, 968 P.2d 993].)

In addition, we deny plaintiff's motion for dismissal of the appeal, which alleged defendants had failed to provide this court with a transcript of the January 12, 2001 hearing on the special motion to strike. Our record reflects that defendants made timely designation and payment for the transcript with the superior court. The transcript was properly filed with this court on May 16, 2001.

Defendants are awarded attorney fees and costs on appeal, the amounts of which are to be determined by the trial court on remand.

Jones, P. J., and Stevens, J., concurred.