Filed 6/9/23 Cabot v. Lakin CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| G.A. CABOT, | B316063 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 21BBCV00228) |
| v. | |
| CHRISTINE LAKIN, et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John J. Kralik, Judge.  Affirmed.

Law Offices of Paul S. Levine, Paul S. Levine, for Plaintiff and Respondent.

Randazza Legal Group, Marc J. Randazza and Alex J. Shepard; Altview Law Group and John M. Begakis, for Defendants and Appellants.

# INTRODUCTION

Plaintiff and respondent G.A. Cabot, a producer and packager of entertainment projects, sued his former production partner, Angela Watson, and podcast hosts Christine Lakin and Alaa Khaled, for defamation. Defendants collectively moved to strike the complaint under Code of Civil Procedure section 425.16, the anti-SLAPP statute,[1] arguing the statements were made in connection with an issue of public interest within the meaning of subdivisions (e)(3) and (e)(4). The trial court disagreed and denied the anti-SLAPP motion.

In this appeal, filed solely by defendants-appellants Lakin and Khaled, we reject appellants' contentions and affirm the trial court's order.

# FACTUAL AND PROCEDURAL SUMMARY
## A.    Factual Background

### 1.    *Production Partnership Between Cabot and Watson*

Angela Watson was a cast member on the network television series Step by Step, playing the character "Karen Foster" for seven seasons, from 1991 to 1998.

---

[1]    SLAPP is the acronym for a strategic lawsuit against public participation. All further undesignated statutory references are to the Code of Civil Procedure.

In late 1996 or early 1997, Watson met G.A. Cabot, a producer and packager of entertainment projects, through her manager. Watson and Cabot subsequently formed a partnership under the name "WatsUp Productions" that pursued public relations and production development deals for more than 20 years. Watson stopped working with Cabot at some point in 2018.

### 2. *Podcast Interview with Watson*

On August 27, 2020, Watson appeared as a guest on a podcast hosted by appellants Christine Lakin and Alaa Khaled entitled the "Worst Ever Podcast." Lakin was a former cast member on the show Step by Step, and many of the listeners are former fans of the show. According to Lakin, the podcast does not hold itself out as a serious source of news reporting and is instead "a fun, entertainment oriented podcast." Watson was invited to appear on the podcast to discuss a Christmas single she had recently recorded entitled "We Love Santa Claus." The interview was ultimately broken out into two podcast episodes that appellants published online on November 27 and December 4, 2020.

During the episodes, Lakin mentioned that appellants discussed Watson on the podcast previously and that Lakin had reconnected with Watson in the last two years. After discussing mask-wearing practices in response to COVID-19,

Lakin and Watson discussed their time on Step by Step and their friendship during the run of the show.

Watson then mentioned that there were some untruths about her online, and stated: "Yes, I did sue my parents. That's a truth, but I really was kind of brainwashed by a certain person and turned against my whole family and my whole cast and friends …." Khaled added, "I think setting the record straight and stomping on whatever people are saying and coming from your mouth is the way to go. So you got involved with this person, which we don't even need to mention who they are."

Lakin subsequently observed: "I think what people don't understand is that in Hollywood, in other places, but I think especially in the entertainment industry, where there are people who are vulnerable and young and looking for guidance, mentorship, success, a path, a career, it is very easy to be manipulated … And there are people out here that know how to do it. And this was, you were not like the first person that he did this to."

Watson responded that the person introduced her to a number of talented people, filmed a video for a potential pilot, and she saw "things happening," which led her to continue down the path, but things got "more intense" over the past "five years . . . with him" whereas "[b]efore it was kind of looser." It was that "intense, like daily focus that really kind of pushed [her] over the edge" and made her "choos[e] to be happy."

Watson stated that after she left him, she thought she could have "negotiations" with him, but "unfortunately, narcissistic abusers, that like that you can't negotiate with them." After Khaled commended Watson for removing herself from the situation, the conversation then moved away from respondent, with Watson and Lakin discussing Watson's current professional career, including her "We Love Santa Claus" song, and what it was like to film Step by Step.

After Watson appeared on the podcast, she inserted a biography on her IMDb profile page discussing her relationship with Cabot.[2]

## B.    The Complaint

Cabot's first amended complaint, the operative pleading, was filed on May 12, 2021, and alleged three causes of action for defamation.

The complaint alleged as follows: Cabot met Watson in 1996 or 1997, when he was producing the packaging and marketing elements for a pet care family video and Watson became the spokesperson for the video. Watson and Cabot thereafter formed a production partnership called "WatsUp

---

[2]    "IMDb" refers to the Internet Movie Database, a well-known entertainment industry website identifying the talent, crew, and entertainment companies working on motion picture projects. The website also provides information concerning television, actors, and other industry professionals. (*John Doe 2 v. Superior Court* (2016) 1 Cal.App.5th 1300, 1306, fn. 3; *Kronemyer v. Internet Movie Database Inc.* (2007) 150 Cal.App.4th 941, 944.)

Productions" Cabot alleged that he and Watson had a nearly 22-year successful public relations and production development relationship.

During that time, Cabot allegedly published announcements in entertainment industry news publications and promotional mailings. He secured "a musical stage play that attracted international singer-actor, Robert Goulet" and caused Watson to be "featured in the prestigious entertainment industry Emmy Magazine." Cabot "facilitated years of WatsUp assisting many nonprofit charity events for communities and families around the country" and coordinated television telethons and a Grammy Award recording artists' concert hosted by Watson and scripted by him. According to Cabot, all of this had "media and entertainment industry benefits for Watson."

Cabot alleged he was not responsible for Watson's lawsuit against her parents, in which she prevailed, or her own renewals of several judgments entered by various courts against her parents.

Cabot alleged that despite this successful business relationship, Watson made a series of defamatory statements, which he set forth in three causes of action.

The first cause of action, for libel per se, was based on a profile Watson created under the name "Angela Watson" and published on IMDb. The profile contained the following statements:

"'Even though a successful TV actress, Angela was far from an experienced Hollywood wild child, and unfortunately her innocence and naivete were taken advantage of by a so called 'production partner' who promised to help her transition into an adult actor with longevity in the business. By the time her family and friends realized he was actually a con man who was brainwashing Angela, it was too late. Over the next 20 years, not only was Angela isolated from everyone she loved, but he also convinced her that she had to sue her parents for supposedly 'stealing her money,' when in fact, he was the one fleecing her acting earnings. Her relationship with the narcissistic abuser turned into a daily nightmare she couldn't escape from. Thankfully, Angela was able to secretly listen to some YouTube videos that she now knows was actually reprogramming her brain to choose to be happy despite her circumstances. After two years of doing so, she realized she had the courage and strength to break free.'"

The second cause of action, for slander per se, was based on allegations that Watson spoke to, sent text and/or email messages to, and left voice messages for various men and women who knew Cabot claiming that he "conned" and "brainwashed" her, abused their working relationship, and "fleeced" her of her acting earnings.

The third cause of action, for slander, alleged that on November 27 and December 4, 2020, on Episodes 107 and 108 of the "Worst Ever Podcast," Watson, Lakin, and Khaled

made various statements about a "'certain person,'" a "'narcissistic abuser,'" who "brainwashed" Watson and "'turned [her] against [her] whole family and [her] whole cast and friends'" and who "'isolated'" her and told her "'lies.'" Cabot attached a transcript of the podcast episodes to the Complaint.

Cabot alleged that these false statements were understood to be concerning him and that his reputation had been damaged.

## C.    The Anti-SLAPP Motion

On June 4, 2021, defendants collectively filed a special motion to strike the complaint pursuant to section 425.16, arguing that their speech was constitutionally protected under the anti-SLAPP statute and that Cabot could not demonstrate a probability of success on any of his causes of action.

Specifically, defendants contended that the allegations in the complaint arose from speech or conduct protected under subdivision (e)(3) and (e)(4) of section 425.16 because the alleged statements were made "in connection with" an "issue of public interest" in that Watson "was and remains a celebrity in the public eye by virtue of her long-running appearance" on Step by Step.  As such, "statements regarding Cabot's involvement, however private, in Watson's professional life are matters of public concern."

8

Defendants also argued that "[n]otwithstanding the public's interest in Watson generally, the fair resolution of sexual harassment and/or assault claims is also undeniably a matter of public concern." Defendants claimed that "each and every Cause of Action in the [Complaint] arises, at least in part, from Watson's truthful retelling of her life experiences with [Plaintiff], who utilized his position of power over Watson as a 'producer and packager' to take advantage of her and sexually assault her."

Finally, defendants argued that "any statements from the Podcast are matters of public concern because they were statements made as part of an entertainment program."

In support of their motion, defendants submitted individual declarations.

Lakin and Khaled asserted that they did not know Cabot and did not conduct any "pre-interview" with Watson that might have revealed any information she provided about Cabot. To the extent they made any comments about Cabot, it was simply to ask Watson follow-up questions or repeat what she had previously stated.

Watson also submitted a declaration. She asserted that after she and Cabot formed their production partnership in 1997, he convinced her to distance herself from her friends and relationships. Cabot subsequently convinced her to sue her parents and she "let Cabot make the decisions regarding the lawsuit behind the scenes."

According to Watson, in 2001, Cabot began taking advantage of Watson sexually by convincing her that she

9

needed to have sex with him and other men as a means of advancing her entertainment career. Watson did not want to engage in such acts, but believed she had to because Cabot "had convinced [her] that [she] needed him and such 'training' to advance [her] career." In 2005, Cabot began to physically abuse her, and in 2011, Cabot moved into her home, at which time the physical abuse increased. In August of 2018, Watson left Cabot by moving out of the house, but left behind a detailed binder containing all the pertinent information regarding their production business.

Watson stated that in August of 2020, Watson appeared on appellants' podcast to discuss a new song she had recently recorded and released. "[T]he conversation naturally developed into a discussion of [their] history together on the Series, why [their] friendship had fallen away, and what [she] was doing now," which eventually led her to discuss her relationship with Cabot.

## D.  Opposition to Anti-SLAPP Motion

In opposing the anti-SLAPP motion, Cabot pointed out that "there [were] no sexual assault allegations made by Watson in any of her libelous or slanderous statements, and no such allegations were made by Watson, Lakin, or Khaled during the podcasts." Cabot argued that any private dispute between Watson and him "is not 'a topic of public interest' and defendants have provided no evidence whatsoever that it is."

Cabot submitted a declaration denying Watson's allegations of abuse and/or psychological manipulation and stated by the time he met Watson, she was in her twenties, had been professionally performing for over a dozen years, including the seven years on Step by Step, and had "talent agents, a personal manager and others in her career." Cabot denied having any involvement in Watson's lawsuit against her parents and noted Watson was successful in suing her parents and establishing they defrauded her out of millions in earnings from her career.

Cabot submitted articles, letters, promotional materials, and other documents representing projects with Watson throughout their 20-year business relationship, including articles documenting Watson's work with the California State Senate to strengthen protections for child actors and her creation of CAST (Child Actors Supporting Themselves).

## E.  Reply to Opposition

In a reply to Cabot's opposition, defendants reasserted their previous contentions and added that "Watson's statements for which she is being sued do include accusations of sexual assault to the extent that she references her relationship with a 'narcissistic abuser.'" Defendants further added that because the podcast was available to the general public, "[d]efendants' actions and statements in connection with the Podcast constitute free

11

speech protected by the First Amendment on such basis alone."

Defendants also filed numerous evidentiary objections to Cabot's declaration and the supporting evidence he submitted.

## F.  Trial Court's Ruling on Anti-SLAPP Motion

In a written decision, the trial court denied defendant's motion to strike the complaint, finding that defendants failed to satisfy the first prong of the Anti-SLAPP statute by failing to demonstrate that the statements identified in the complaint were made in connection with an issue of public interest.

The court rejected defendants' assertion the statements alleged in the complaint were matters of public concern because Watson is a "celebrity." Citing *Bernstein v. LaBeouf* (2019) 43 Cal.App.5th 15, 23-24 (*Bernstein*), the court pointed out that a "defendant's celebrity status, on its own, is not sufficient to render anything the defendant says or does subject to anti-SLAPP protections." The court further noted that there were no allegations that Cabot was a well-known public figure, or someone in the public eye, or that he has been involved in issues of public interest. The court found that the statements made about Cabot — i.e., that he was "a conman, that he brainwashed [Watson], stole money from [Watson], etc." concerned "private issues of [Watson's] personal life."

12

To the extent defendants asserted the statements concerned matters involving sexual harassment or assault, the court observed that there were no statements involving sexual harassment or assault in Cabot's complaint for defamation, the podcast transcript, or Watson's IMDb profile. The court rejected defendants' assertion that Watson's characterization of Cabot as a "'narcissistic abuser'" equated to "sexual harassment/assault" as the court could not find "this ambiguous phrase leads to such a conclusion."

Finally, as to defendants' claim that the conduct or statements of the complaint were matters of public concern because they "were statements made as part of an entertainment program" the court found this argument to be based on mere "generalities" of the "'entertainment industry'" and thus too broad or amorphous to merit anti-SLAPP protection.

The court thus found that defendants failed to establish their burden on the first prong of the anti-SLAPP statute and the burden therefore did not shift to Cabot to show a probability of prevailing on the merits of his complaint.[3] The court denied the motion to strike.

Appellants Lakin and Khaled timely appealed from the trial court's order. (§§ 425.16, subd. (i), 904.1, subd. (a)(13). Watson is not a party to this appeal.

---

[3] The trial court found it unnecessary to rule on any evidentiary objections raised by the parties.

## DISCUSSION

### A. Anti-SLAPP Statute and Relevant Legal Principles

#### 1. *Standard of Review*

"We review de novo the grant or denial of an anti-SLAPP motion" and "exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity." (*Park v. Board of Trustees of California State Univ.* (2017) 2 Cal.5th 1057, 1067 (*Park*).) In addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based (*Symmonds v. Mahoney* (2019) 31 Cal.App.5th 1096, 1104 (*Symmonds*)), and we accept as true the evidence favorable to plaintiffs. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.)[4]

#### 2. *Section 425.16 The Anti-SLAPP statute*

"Code of Civil Procedure section 425.16 provides a procedure for the early dismissal of what are commonly known as SLAPP suits (strategic lawsuits against public

---

[4] Although an anti-SLAPP motion need not be directed at a cause of action in its entirety, but "may be used to attack parts of a count as pleaded" (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 393 (*Baral*)), defendants collectively argued that all statements were equally protected under section 425.16, subds. (e)(3) & (4).

participation)—litigation of a harassing nature, brought to challenge the exercise of protected free speech rights. The section is thus informally labeled the anti-SLAPP statute." (*Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 665, fn. 3.)

Under section 425.16, a special motion to strike involves a two-step process. First, the defendant must make a prima facie showing that the plaintiff's "cause of action … aris[es] from" an act by the defendant "in furtherance of the [defendant's] right of petition or free speech … in connection with a public issue." (§ 425.16, subd. (b)(1); *Cabral v. Martins* (2009) 177 Cal.App.4th 471, 478 [moving party must show the act underlying the challenged cause of action fits one of the categories described in section 425.16, subdivision (e)].) If the defendant satisfies this threshold burden, plaintiff must then demonstrate a reasonable probability of prevailing on the merits. (*Ibid*.) If the defendant fails to meet his or her burden on the first step, the court should deny the motion and need not address the second step. (*Symmonds*, *supra*, 31 Cal.App.5th at pp. 1103-1104.)

3. *The Statutory Subdivisions on Appeal: (e)(3) & (e)(4)*

The anti-SLAPP statute protects activity described in section 425.16, subdivision (e). Subdivision (e) provides: an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in

15

connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e); see *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117-1118 [discussing types of statements covered by anti-SLAPP statute].)

Both subdivision (e)(3) and (e)(4) require a showing that a statement be "'in connection with' an issue of public interest." (*Bernstein*, *supra*, 43 Cal.App.5th at p. 23, fn. 5.) In addition, subdivision (e)(3), requires that the statements be made in a public forum, while subdivision (e)(4) also protects private communications. (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 897-898 (*Wilbanks*).)

In the trial court, defendants collectively argued the statements underlying all three causes of action met the requirements of both subdivision (e)(3) and (e)(4). On appeal, appellants focus on section (e)(3), given that the only cause of action pled against appellants (as opposed to

16

Watson) turned on statements made on a public podcast. Cabot, however, argues that appellants forfeited their right to make any subdivision (e)(3) arguments because they did not separately argue the merits of subdivision (e)(3) in the trial court. We find no forfeiture.

First, appellants expressly cited both subdivisions in their anti-SLAPP motion, and the trial court so recognized. Second, appellants cited to *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798 (*Seelig*), in arguing that "statements made in a radio broadcast constitute[] free speech under the first prong of the anti-SLAPP statute." Third, Cabot does not dispute appellants' assertion that any statement made during their Podcast, which was made available online and accessible to the general public, falls within the "public forum" requirement of (e)(3). (See *Seelig*, *supra*, 97 Cal.App.4th at pp. 801, 807 [comments made during on-air radio discussion between talk radio co-hosts and their on-air producer fell within the "open forum" clause of subdivision (e)(3)]; *Wilbanks*, *supra*, 121 Cal.App.4th at p. 897 [explaining that the "Web, as a whole, can be analogized to a public bulletin board" and thus statements made on Web qualify as having been made in a public forum]; *Cole v. Patricia A. Meyer & Associates* (2012) 206 Cal.App.4th 1095, 1121 ["An Internet Web site that is accessible to the general public is a public forum"].)

As such, the only issue we must determine in this appeal is whether the statements uttered during appellants'

podcast were made in connection with an issue of public interest.[5]

## B.    Relevant Cases

### 1.    *FilmOn and the "Wilbanks Rule"*

The anti-SLAPP statute does not define "public interest."  In *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 140, (*FilmOn*), our high court explained that "[i]n articulating what constitutes a matter of public interest, courts look to . . . specific considerations" including whether the subject of the speech or activity (1) "'was a person or entity in the public eye'" or "'could affect large numbers of people beyond the direct participants'" [citation]; (2) "'occur[red] in the context of an ongoing controversy, dispute, or discussion'" [citation]; (3) or "'affect[ed] a community in a manner similar to that of a governmental entity.'" [Citation.]  (*Id.* at pp. 145-146.)

Our high court noted that courts have nevertheless continued to struggle "to articulate the requisite nexus between the challenged statements and the asserted issue of public interest—to give meaning, in other words, to the 'in connection with' requirement."  (*FilmOn, supra*, 7 Cal.5th at p. 149).  The Court sought to clarify the issue by adopting

---

[5]    In any event, as indicated in our discussion, *post*, the result is the same under either (e)(3) or (e)(4).

"the *Wilbanks* rule" announced in *Wilbanks, supra,* 121 Cal.App.4th 883, wherein the court explained that "'it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.'" (*FilmOn*, *supra,* 7 Cal.5th at p. 150, quoting *Wilbanks*, *supra,* 121 Cal.App.4th at p. 898, italics added.)[6] Our high court further quoted *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280 for the proposition that "[t]he fact that 'a broad and amorphous public interest' can be connected to a specific dispute is not enough."[7] (*FilmOn*, *supra,* 7 Cal.5th at p. 150.)

---

[6]     Prior to setting out this requirement, the *Wilbanks* court noted that both (e)(3) and (3)(4) "are limited by the requirement that the statement or conduct be connected with an issue of public interest." (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 897-898.)

[7]     After adopting the *Wilbanks* rule, our high court noted that the nexus-related inquiry "is one a court can hardly undertake without incorporating considerations of context—including audience, speaker, and purpose" (*FilmOn*, *supra*, 7 Cal.5th at pp. 151-152) and articulated a two-part test for the (e)(4) inquiry:  First, the court asks what public issue or issue of public interest the speech in question implicates—a question answered by looking to the content of the speech. (*Ibid.*)  Second, the court asks "what functional relationship exists between the speech and the public conversation about some matter of public interest"—a question answered by considering the context of the speech. (*Id.* at p. 150.)

In this appeal, appellants acknowledge that under *FilmOn*, statements are not protected if they are "'too tenuously tethered to the issues of public interest they implicate, and too remotely connected to the public conversation about these issues.'" but state that "the two-part analysis in *FilmOn* . . . has no application in determining whether alleged conduct is protected under subdivision (e)(3)" because
*(Fn. is continued on the next page.)*

19

In conducting our analysis, we also find instructive the following cases: *Albanese v. Menounos* (2013) 218 Cal.App.4th 923 (*Albanese*); *Bernstein, supra,* 43 Cal.App.5th 15; and W*oodhill Ventures, supra,* 68 Cal.App.5th 624.

### 2. *Albanese, Bernstein, and Woodhill Ventures*

#### i. *Albanese v. Menounos*

In *Albanese*, a stylist who worked on the set of Access Hollywood, sued television personality Maria Menounos for

---

subdivision (e)(3) contains an express context requirement — i.e., that the statements were made in a "public forum." We need not delve into this issue.

Appellants have failed to show how a formal application of the two-part *FilmOn* test would lead to a different result under subdivision (e)(3), and we discern no difference in this case. (See *Woodhill Ventures LLC v. Yang* (2021) 68 Cal.App.5th 624, 632 (W*oodhill Ventures)* [rejecting contention that statements were protected under (e)(3) by citing *FilmOn*'s overall conclusion that defendant's statements were "'too tenuously tethered to the issues of public interest they implicate'"]; cf. *FilmOn, supra,* 7 Cal.5th at p. 151 [after adopting *Wilbanks* rule and setting out two-part test, Court noted that its holding adds no additional requirement to (e)(4) and is simply a "reasonable interpretation of the provision's existing requirement that statements be made 'in connection with' an issue of public interest—an interpretation informed by the statutory purpose explicitly articulated in the preamble to the anti-SLAPP Statute"]; *Bernstein, supra,* 43 Cal.App.5th at p. 23, fn. 5 [applying two-part *FilmOn* test in analyzing both (e)(3) and (e)(4) and concluding there was no reason to find that *FilmOn*'s analysis did not apply to both prongs of anti-SLAPP statute given that both subdivisions contain the same "in connection with" requirement].)

defamation after Menounos accused Albanese of stealing from her while she was employed by Menounos. (*Albanese*, *supra*, 218 Cal.App.4th at p. 926.) The appellate court affirmed the denial of Menounos' anti-SLAPP motion, determining that even assuming that Albanese herself was "rather well known in some circles for her work as a celebrity stylist and fashion expert, there is no evidence that the public is interested in this private dispute concerning her alleged theft of unknown items from Menounos." (*Id.* at p. 936.)

### ii.   *Bernstein v. LaBeouf*

*Bernstein* concerned video footage of defendant Shia LaBeouf, an actor, confronting Bernstein, a bartender who had refused to serve LaBeouf alcohol, and calling him a racist, which was posted on the internet and broadcast on television. (*Bernstein, supra*, 43 Cal.App.5th at p. 18.) Bernstein sued LaBeouf for assault, slander, and intentional infliction of emotional distress, and LaBeouf countered with an anti-SLAPP motion. (*Ibid*.) The appellate court affirmed the denial of LaBeouf's anti-SLAPP motion, stating that while "racism is undoubtedly an issue of public interest, a defendant cannot convert speech that would otherwise not be [subject to the anti-SLAPP statute] into protected activity by 'defining the [ ]narrow dispute by its slight reference to the broader public issue.'" (*Id* at p. 24.) The court further found that the matter was a private dispute even though LaBeouf

was a famous actor, and the public has an interest in the life and work of entertainers for anti-SLAPP purposes. (*Id.* at p. 23 ["celebrity status, on its own, is not sufficient to render anything the [plaintiff] says or does subject to anti-SLAPP protection"].)

### iii. *Woodhill Ventures v. Yang*

In *Woodhill Ventures*, the wife of a "[s]elf-proclaimed celebrity jeweler" with 1.5 million social media followers, Ben Yang, ordered a cake from Big Sugar Bakeshop (Big Sugar) for the couple's seven-year-old son. (*Woodhill Ventures, supra,* 68 Cal.App.5th at pp. 626, 627.) Big Sugar created a cake, pursuant to Yang's wife's instructions, which appeared to be topped with a knocked-over beaker from which pill-like objects spilled. *(Id.* at p. 638.) When the Yangs received the cake, they believed the fondant pills looked too realistic and demanded an apology and a refund. (*Id.* at pp. 626-627, 628.)

Dissatisfied with the bakery's response to his complaints, Yang aired his grievance on his podcast and to his 1.5 million followers on social media. (*Id.* at p. 627.) Big Sugar accused Yang of making several false statements about the bakery, including the following on Instagram, a social media platform: "'Anyone in their even high mind would know that you should NEVER EVER PUT DRUGS ON A 7 year old kids [sic] bday cake!'" (*Id.* at p. 628.) Yang filed an anti-SLAPP motion contending that his statements

were protected speech under the statute. The trial court disagreed and denied the motion. (*Id.* at p. 630.)

On appeal, in considering whether Yang's speech concerned an issue of public interest, the court rejected Yang's contention that his statements were of public interest because he was a celebrity with 1.5 million social media followers and Big Sugar had been published in national publications. The court pointed out that Big Sugar is a small business, with two shops in Los Angeles (*id.* at p. 634), while Yang's own celebrity status did not automatically mean that everything he said was of public interest. (*Id.* at p. 633.)

The court also rejected Yang's contention that "his statements involve an issue of public interest because they were about the dangers of 'candy confusion,' or children mistakenly eating pills they believe are candy." (*Id.* at p. 632.) The court concluded that although candy confusion was a topic of public interest, Yang's statements lacked a sufficient degree of closeness to that topic and were instead an unprotected effort "'"to gather ammunition"'" in his spat with Big Sugar. [Citation.]" (*Id.* at pp. 632-633.)

## C. Analysis

In this appeal, appellants argue that any statements on the Podcast were protected under the anti-SLAPP statute due to Watson's celebrity status. Appellants also seek to redefine the "issue of public interest" in terms broader than those advanced in their anti-SLAPP motion below. For the

reasons explained below, appellants' efforts are unconvincing.

> 1. *Watson's purported celebrity status is, in and of itself, insufficient to warrant anti-SLAPP protection for the statements at issue*

Appellants discuss at length Watson's purported celebrity status, noting that "[t]here is literally an entire industry that thrives off of reporting on celebrities and actors – and a sub-genre of 'where are they now?' productions" and that "paparazzi snap photos of the most mundane tasks being performed by celebrities."

However, as the holdings of *Albanese*, *Bernstein*, and *Woodhill Ventures,* make clear, celebrity status does not automatically immunize every statement that a celebrity makes.[8] (*Bernstein, supra,* 43 Cal.App.5th at pp. 23-26; *Woodhill Ventures, supra,* 68 Cal.App.5th at p. 633;

---

[8] As indicated in our procedural summary, respondent alleged in his complaint that all three defendants (Watson, Lakin, and Khaled) were liable for slander for the statements made during the podcast, and defendants collectively filed their anti-SLAPP motion and argued that all statements alleged in the complaint were protected as statements made in connection with a public issue under subdivisions (e)(3) and (e)(4) of the anti-SLAPP statute.

Given that our opinion is limited to prong one of the anti-SLAPP statute, we need not assess whether any or all statements identified in the podcast-related claim of the complaint are attributable to appellants; instead we treat appellants and Watson as a singular entity for purposes of our discussion.

24

*Albanese, supra*, 218 Cal.App.4th at p. 936.) Instead, these cases illustrate that where the statements *target* an individual or entity who does not reside in the public eye, defendants cannot rely on their own fame to broadly sweep into anti-SLAPP protection. (See, *e.g., Bernstein, supra*, at pp. 23-26; *Woodhill Ventures, supra*, at p. 633.)

Appellants nevertheless attempt to do so by citing *Seelig, supra*, 97 Cal.App.4th at pp. 807-808, and arguing, if "[t]he court in *Seelig* found that a one-time contestant of a reality show was a public figure" then "a recurring cast member for 7 seasons of a nationally syndicated television show is certainly one as well." However, the comments in *Seelig* were not uttered *by* the plaintiff but were *about* her and her participation in a television show that "generated considerable debate within the media on what its advent signified about the condition of American society" at that time. (*Id.* at p. 807.) Specifically, in *Seelig* the appellate court determined that statements made on a radio show regarding the plaintiff's participation on Who Wants to Marry a Multimillionaire satisfied the public interest standard because "[b]y having chosen to participate as a contestant in the [s]how, plaintiff voluntarily subjected herself to inevitable scrutiny and potential ridicule by the public and the media." (*Id.* at pp. 807-808.)

Here, as the trial court pointed out, appellants did not allege that respondent himself, the target of the statements, is a public figure or person in the public eye. Moreover, in Watson's own declaration she stated that "Cabot was a very

25

private person who did not seek personal publicity resulting from his work with me." As such, appellants failed to sustain their burden with respect to this category of public interest. (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132-1133 ["'those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure'"].)[9]

### 2. *Appellants' attempts to reframe the "issue of public interest" on appeal are unpersuasive*

In their opening brief, under the heading "The Relevant Public Issue," appellants argue that "[t]he [podcast] episode is not about Respondent" but about "Watson and Lakin's time on Step by Step, Watson's disconnection from the show's cast members caused by an abusive and manipulative agent, and Watson's successful struggle to free herself from this relationship."[10] Appellants assert that

---

[9] We note that in their anti-SLAPP motion, appellants in passing cited *Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, to observe that "even statements about a private person and their involvement in the private activities of a celebrity can become an issue of public interest . . ." Appellants make no mention of *Hall* in any of their briefs before this court. Given this — and the fact that the court in *Bernstein* thoroughly discussed the unique features of *Hall* (*Bernstein*, *supra*, 43 Cal.App.5th at pp. 25-26) —we do not discuss *Hall* in this opinion.

[10] Appellants define the term "agent" as a "general term for managers, agents, promoters and others who assist in developing a celebrity's career" and state that "[r]espondent's specific job title in relation to the work he performed for Watson is immaterial." We note, *(Fn. is continued on the next page.)*

26

"[t]he deliberate choice not to identify Respondent shows that the subject of the podcast episodes was not any kind of personal dispute Watson had with Respondent, but rather providing information to the podcast's audience about the dangers young actors in Hollywood can face."

There are several problems with appellants' position on appeal. First, the question of whether or not the statements were actually about respondent is relevant to the merits of respondent's claim. (See *Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042-1046 [discussing "of and concerning" aspect of defamation].) In addressing the first prong of the anti-SLAPP statute, we accept the plaintiff's allegations as true (*Park, supra,* 2 Cal.5th at p. 1067), and appellants conceded in their first prong argument below that the statements alleged in the FAC were about respondent and Watson's personal relationship with him.

Second, in the trial court, appellants identified the issue of public interest differently than they do presently, namely as one of "sexual harassment and/or assault." However, the challenged statements did not discuss sexual harassment or assault. As the trial court observed, there were no statements about sexual harassment or assault in either Cabot's complaint for defamation or the podcast

---

however, that in arguing the merits prong of the anti-SLAPP statute in the trial court, appellants argued that the statements in the complaint could not reasonably be construed to be about respondent because he "never formally represented [Watson] as an agent or manager, or in any other role as a public-facing representative."

transcript. Thus, the allegations made by Watson in a separate (and wholly disputed) declaration she submitted in support of the anti-SLAPP motion could not provide a basis upon which defendants could meet their burden on the initial prong. (See *Medical Marijuana, Inc. v. ProjectCBD.com* (2016) 6 Cal.App.5th 602, 621 ["It would be inappropriate for us to insert into a pleading claims for relief based on allegations of activities that plaintiffs simply have not identified . . . . It is not our role to engage in what would amount to a redrafting of the first amended complaint . . . . and then assess whether the pleading that we have essentially drafted could survive the anti-SLAPP motion directed at it"]; cf. *Moriarty v. Laramar Management Corp.* (2014) 224 Cal.App.4th 125, 135 [noting defendant's anti-SLAPP argument was based on a "selective reading" of the complaint].)

To the extent appellants now argue that the statements were about the "exploitation of young actors" or "the dangers young actors in Hollywood can face" or "the exploitation of young actors by their agents" (after redefining the term "agent"), these arguments were not set forth in the initial anti-SLAPP motion, and respondent did not have the opportunity to oppose them. (*Cabral v. Martins*, *supra*, 177 Cal.App.4th at p. 478 [stating, generally, that anti-SLAPP movant must make ""a threshold showing that the challenged cause of action is one arising from protected activity . . . by demonstrating *that the act underlying the plaintiff's cause* fits one of the categories spelled out in

section 425.16, subdivision (e)""""], italics added; see also *World Financial Group, Inc. v. HBW Ins. & Financial Services Inc.* (2009) 172 Cal.App.4th 1561, 1569 [stating anti-SLAPP movants forfeited new arguments regarding content of speech], disapproved on other grounds in *FilmOn, supra,* 7 Cal.App.5th 133, 246); cf. *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264 [forfeiture rule is designed to promote efficiency and deter gamesmanship].)

Further, appellants' arguments bespeak an effort to tie a specific or personal dispute to "'a broad and amorphous public interest'" (*FilmOn*, *supra,* 7 Cal.5th at p. 150) — or a "synecdoche theory of public issue in the anti-SLAPP statute," where "[t]he part [is considered] synonymous with the greater whole." (*Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 34). "[V]irtually always, defendants succeed in drawing a line—however tenuous—connecting their speech to an abstract issue of public interest." (*FilmOn.com Inc.*, 7 Cal.5th at p. 150.) However, we must determine whether the statements at issue in some manner "contribute to the public debate." (*FilmOn*, *supra*, 7 Cal.5th at p. 150, quoting *Wilbanks*, *supra,* 121 Cal.App.4th at p. 898.)

Here, the statements were made about the private relationship between Watson and respondent. While Watson had enjoyed celebrity decades prior and may still have been known to listeners of the podcast, there is no evidence that this relationship with respondent was the subject of any "'ongoing controversy, dispute, or discussion'" (cf. *FilmOn*,

29

*supra*, 7 Cal.5th at p. 145; quoting *Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119.) — or that respondent himself is a public-facing agent, producer, or other individual. (*FilmOn*, at p. 145.) Moreover, Watson went on the show for the purpose of speaking about the release of her Christmas song. Appellants admit that the Worst Podcast Ever is not a serious source of news reporting but a fun show that attracts listeners interested in entertaining topics. Thus, based upon the content and context of the statements, they were not made in connection with an issue of public interest such that they are protected. (*FilmOn, supra,* at pp. 148-149.)

Accordingly, and for the reasons discussed throughout this opinion, we must affirm the trial court's order.[11]

---

[11] In light of our decision, we need not reach the second step of the section 425.16 analysis, namely, whether there is a probability of success on the merits. (See *Baral, supra*, 1 Cal.5th at p. 385 [second step reached only if "the defendant makes the required showing" as to protected activity].)

**DISPOSITION**

The order denying the anti-SLAPP motion is affirmed. Respondent shall recover his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MORI, J.

We concur:

CURREY, Acting P.J.

COLLINS, J.