Filed 3/28/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| BRENT SEXTON, | B333481 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. 23STCV11417 |
| APPLE STUDIOS LLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael P. Linfield, Judge.  Reversed and remanded.

Mitchell Silberberg & Knupp , Emma Luevano, Stephen A. Rossi and Rebecca Benyamin for Defendant and Appellant.

JW Howard/Attorneys, John W. Howard and Scott J. Street for Plaintiff and Respondent.

_____

During the COVID-19 pandemic, Apple Studios LLC offered Brent Sexton a film role on the condition he get

vaccinated.  Sexton refused vaccination and sued Apple when it withdrew its offer and cast a different actor.  The trial court erroneously denied Apple's anti-SLAPP motion.  Apple's casting was conduct in furtherance of free speech in connection with two public issues:  a prominent entertainment company (1) voted with its feet in the vaccination controversy and (2) decided how to portray an enigmatic figure in American history.  On the merits, Apple's evidence negated Sexton's lawsuit.  Sexton had no privacy claim because Apple was entitled to rely on authoritative views about sensible ways to protect its workplace.  Sexton's discrimination claims failed because he was unqualified for the work.  Safety was a job requirement Sexton could not satisfy.  Unelaborated citations are to the Code of Civil Procedure.

## I

We sketch facts.

## A

Sexton is a professional actor who has made many film and television appearances.  Apple is a company founded by Steve Jobs, who was, and in death remains, a public figure.  (E.g., Jobs (Five Star Feature Films et al. 2013); Steve Jobs (Legendary Pictures et al. 2015); Influential Individuals, Steve Jobs: The Life, Lessons & Rules for Success (2018); Walter Issacson, Steve Jobs (2021).)  Today, Apple is known worldwide.  Apple expanded into film and television production with the advent of Apple Studios LLC.

In 2020, Apple embarked on a limited series called *Manhunt* about the pursuit of assassin John Wilkes Booth.  The series was based on James Swanson's bestselling 2006 book Manhunt:  The 12-Day Chase for Lincoln's Killer.  Apple planned

to film in Georgia and to stream its project through a service with millions of subscribers.

The press covered *Manhunt*'s planning and production. News articles described Apple's casting of this series. Press reporting in 2022 included information about characters, plot, actors, their agents, and executives working on the series. One article about *Manhunt* said Apple was the first company to reach a market capitalization of $3 trillion. Another claimed "Apple continues to spend big bucks on premium packages featuring bankable stars."

B

COVID-19 appeared in late 2019 and came to the U.S. in January 2020. (COVID-19 Timeline (Last Reviewed Jul. 8, 2024) CDC Museum <https://www.cdc.gov/museum/timeline/covid19.html> [as of Mar. 26, 2025], archived at <https://perma.cc/4YYA-XUD8>.)

On March 13, 2020, President Trump declared a national emergency due to COVID-19. (Pres. Proc. No. 9994, 85 Fed.Reg. 15337 (Mar. 18, 2020); Joint resolution for national emergency, Pub.L. No. 118-3, 137 Stat 6 (2023).)

Also in March 2020, Governor Newsom issued a statewide stay-at-home order instructing residents to leave their homes only when necessary. The order shut down all but essential businesses. (COVID-19 Timeline (Last Reviewed Jul. 8, 2024) CDC Museum <https://www.cdc.gov/museum/timeline/covid19.html> [as of Mar. 26, 2025], archived at <https://perma.cc/4YYA-XUD8>.)

Other states responded in different ways. Georgia, for instance, imposed relatively fewer COVID-19 restrictions.

3

In 2020 and early 2021, the Food and Drug Administration approved three vaccines for emergency use.

In response to the pandemic, California filming production closed in 2020 and would not resume until producers and unions negotiated agreements about COVID-19 safety protocols.

In 2020, Apple retained experts to advise it on COVID-19 vaccine efficacy. These consultations continued, and included updates as new data became available. For instance, one study showed vaccines were "highly effective at preventing serious illness, hospitalization, and death from COVID-19." Apple's experts cited pertinent scientific studies. (See, e.g., Scobie et al., Monitoring Incidence of COVID-19 Cases, Hospitalizations, and Deaths, by Vaccination Status — 13 U.S. Jurisdictions, April 4–July 17, 2021 (Sep. 17, 2021) CDC Morbidity and Mortality Weekly Report <https:// www.cdc.gov/mmwr/volumes/70/wr/ mm7037e1.htm?s_cid=mm7037e1_w> [as of Mar. 26, 2025], archived at <https://perma.cc/ 6Q5J-RS4M>.)

Hollywood trade groups and unions reached a "Return to Work Agreement" in September 2020. The goal was to resume film productions safely. The parties revised the agreement as the pandemic evolved. The agreement split production into four groups. The group pertinent to this case comprised people in "Zone A," which included all actors working on set. The agreement stated each individual had the "responsibility and duty to comply with those protocols and procedures, not only for the individual's own protection, but also for the protection of others in the workplace."

In 2021, the U.S. Centers for Disease Control and Prevention (which we shorten to the "CDC") reported that all vaccines approved or authorized in the U.S. were effective

4

against COVID-19. The vaccines provided "considerable protection against severe disease and death caused by COVID-19." "Evidence suggests the U.S. COVID-19 vaccination program has substantially reduced the burden of disease in the United States by preventing serious illness in fully vaccinated people and interrupting chains of transmission."

On March 8, 2021, the CDC announced that fully vaccinated people could safely gather with other fully vaccinated people indoors without masks and without social distancing. (COVID-19 Timeline (Last Reviewed Jul. 8, 2024) CDC Museum <https://www.cdc.gov/museum/timeline/covid19.html> [as of Mar. 26, 2025], archived at <https://perma.cc/4YYA-XUD8>.) The agency reported "unvaccinated individuals are more than twice as likely to be reinfected with COVID-19 than those who were fully vaccinated after initially contracting the virus. These data further indicate that COVID-19 vaccines offer better protection than natural immunity alone and that vaccines, even after prior infection, help prevent reinfections." (New CDC Study: Vaccination Offers Higher Protection than Previous COVID-19 Infection (Aug. 6, 2021) CDC Media Statement <https://archive. cdc.gov/#/details?url=https://www.cdc.gov/media/releases/2021/s0 806-vaccination-protection.html> [as of Mar. 26, 2025], archived at <https://perma.cc/B2VY-SH62>.)

The CDC unequivocally supported vaccination.

"Should I get a COVID-19 vaccine even if I recently had a COVID-19 infection? Yes. Getting a COVID-19 vaccination is a safer and more dependable way to build immunity to COVID-19. The vaccine improves the chances of avoiding the worst outcomes of the virus such as severe illness, hospitalization, and death." "Since 2020, COVID-19 has caused millions of cases of severe

5

illness, hospitalization, and death in the United States.  Studies continue to show that vaccination lowers the risk of severe illness and of developing long COVID.  The CDC recommends that all people 6 months and older stay up to date on the COVID-19 vaccine."  (Cal. Dept. of Pub. Health, Get the Facts on COVID-19 Vaccines (Feb. 29, 2024) <orihttps://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Get-the-Facts-on-Vaccines.aspxginalurl> [as of Mar. 26, 2025], archived at <https://perma.cc/JH8J-SXEM>); see also Scobie et al., Monitoring Incidence of COVID-19 Cases, Hospitalizations, and Deaths, by Vaccination Status — 13 U.S. Jurisdictions, April 4–July 17, 2021 (Sep. 17, 2021) CDC Morbidity and Mortality Weekly Report https://www.cdc.gov/mmwr/volumes/70/wr/mm7037e1.htm?s_cid=mm7037e1_w> [as of Mar. 26, 2025], archived at <https://perma.cc/ 6Q5J-RS4M> [vaccinated individuals were more than ten times less likely to be hospitalized for COVID-19, and more than ten times less likely to die from COVID-19].)

In July 2021, the entertainment groups revised their agreement to require mandatory vaccination for all actors working on sets, subject to accommodation exceptions.

In August 2021, the Los Angeles County Board of Supervisors ordered vaccination for all county employees by October 1, 2021.  (Chair of the County of Los Angeles Board of Supervisors Exec. Order Following Proclamation of Existence of a Local Emergency Due to Novel Coronavirus – COVID-19 (Aug. 4, 2021) Publication <https://employee.hr.lacounty.gov/wp-content/uploads/2021/09/Executive-Order-COVID-19-Vaccines-for-LACo-Employees.pdf> [as of Mar. 26, 2025], archived at <https://perma.cc/7WKP-7KPN>.)

On November 19, 2021, the CDC expanded its recommendations for booster shots to include all adults. The "CDC continues to encourage the 47 million adults who are not yet vaccinated to get vaccinated as soon as possible to protect themselves, their families, loved ones and communities." (CDC Expands Eligibility for COVID-19 Booster Shots to All Adults (Nov. 19, 2021) CDC Media Statement <https://archive.cdc.gov/#/ details?url=https:// www.cdc.gov/media/releases/2021/s1119-booster-shots.html> [as of Mar. 27, 2025], archived at <https:// perma.cc/8ZSM-6ZCD>.)

Apple's experts advised it that, although tests "are helpful tools and can aid in the prevention of COVID-19, they are no substitute for vaccination." Testing lags meant a person could be "spreading COVID-19 and not even know it." Test inaccuracy counseled in favor of repeated tests after one negative result from an at-home antigen test. The Food and Drug Administration said repeated testing after a negative result would "help prevent people from unknowingly spreading" the virus. This federal agency recommended two negative tests for people with symptoms or three tests for those without symptoms, with the retesting performed at 48 hour intervals. (COVID-19 Testing: What You Need to Know (Updated May 11, 2023) CDC <https://archive.cdc.gov/#/details?url=https://www.cdc.gov/corona virus/2019-ncov/symptoms-testing/testing. html> [as of Mar. 27, 2025], archived at <https://perma.cc/XJP5-UX6V>); see also Overview of Testing for SARS-CoV-2, the virus that causes COVID-19 (Updated May 11, 2023) CDC <https://archive.cdc.gov/ #/details?url=https:// www.cdc.gov/coronavirus/2019-ncov/hcp/ testing-overview.html> [as of Mar. 27, 2025], archived at <https://perma.cc/L9E9-JM6M>) [a negative test result "doesn't

rule out that you could have an infection"]; Testing for COVID-19 (undated) CDC <https://www.cdc.gov/ covid/testing/index.html> [as of Mar. 27, 2025], archived at <https://perma.cc/D9B5-2342> [same].)

In early January 2022, the U.S. reported nearly one million new COVID-19 infections—the highest daily total of any country in the world.  (COVID-19 Timeline (Last Reviewed Jul. 8, 2024) CDC Museum <https://www.cdc.gov/museum/timeline/ covid19.html> [as of Mar. 26, 2025], archived at <https:// perma.cc/4YYA-XUD8>.)

On May 12, 2022, total recorded U.S. deaths due to COVID-19 reached one million.  (COVID-19 Timeline (Last Reviewed Jul. 8, 2024) CDC Museum <https://www.cdc.gov/museum/timeline/ covid19.html> [as of Mar. 26, 2025], archived at <https:// perma.cc/4YYA-XUD8>.)

In 2022, the number of deaths from COVID-19 continued to increase.

C

In 2022, Apple began pre-production work on *Manhunt*.

Based on then-current scientific evidence, Apple selected mandatory vaccination to promote safety on its *Manhunt* sets.

Apple decided masking, periodic testing, and socially distancing were insufficient for seven reasons.

First, filming often requires actors and crew to work in tight quarters.  Close proximity can be essential to a story.  Booth shot Lincoln, for instance, from a distance of just two feet.  (David Herbert Donald (1995) *Lincoln* 597–598.)

Second, actors could not wear masks on camera in historical productions.

8

Third, lags made testing inadequate. Infected people might not immediately test positive. Someone testing negative may have been contagious for days.

Fourth, Apple executives believed fully vaccinated people were at lower risks of contracting COVID-19 and of suffering a severe illness if infected.

Fifth, people working on *Manhunt* were at high risk of severe COVID-19 complications due to age or preexisting conditions.

Sixth, the filming venue was Georgia, which imposed less restrictive COVID-19 measures, meaning cast and crew faced an increased off-set risk of exposure.

Seventh, mandatory vaccinations reduced the risk of production disruptions. Cast or crew members testing positive had to isolate. If *other* people exposed to that COVID-19-positive person were fully vaccinated, however, then the CDC guidance and the union agreement permitted these others to mask and test instead of being quarantined. Mandatory vaccinations thus potentially allowed greater production continuity and budget discipline.

D

Sexton auditioned for *Manhunt*. On March 1, 2022, Apple conditionally offered Sexton the role of Johnson. A condition was that Sexton be fully vaccinated.

Apple's offer was for a seven-episode minimum, with a total contract value of at least $595,000, plus incentives.

Sexton sought a medical exemption from the mandatory vaccination, citing his history of blood clotting from thrombocytopenia and deep vein thrombosis. Sexton said

9

vaccines would increase his risk of blood clots and claimed he had already had COVID-19, so antibodies would make him safe.

Apple considered but rejected Sexton's exemption request. Apple decisionmakers concluded vaccination was essential for the actor playing Johnson. The executive producer explained that "*Manhunt* is a period piece set in the 1800s. It would have undermined the entire television series if any character (including President Andrew Johnson, Mr. Sexton's conditionally-offered role) appeared in it wearing a face mask. Forcing the production to hire Mr. Sexton, therefore, would have prohibited the creative team from telling the story that they were hired to tell."

Moreover, this actor would have to be near others during performances and in hair and makeup sessions. "[M]akeup is necessary to make actors look authentic on camera, which is critical to the artistic and expressive nature of the story." One cannot make up masked actors because masks cover faces.

Apple likewise considered scheduling. A quarantine requirement in the event of a positive COVID-19 test, the company decided, could upend the planned shooting schedule and hence the budget.

An Apple executive testified that "Apple denied Mr. Sexton's request for an exemption. Mr. Sexton's disability and medical conditions were not a factor in our decision to deny his request for exemption from the vaccination requirement applicable to all cast and crew in 'Zone A' and to withdraw his conditional offer. Instead, the decision was based on a neutral vaccination requirement that could not be altered without endangering safety on set, changing the creative requirements, and potentially interfering with production."

10

E

Sexton sued Apple on four claims: declaratory relief about an invasion of privacy, and disability discrimination based on disparate treatment, on a failure to accommodate, and on a failure to engage in an interactive process.

Apple filed an anti-SLAPP motion. Accompanying its motion were over 500 pages of evidence and requests for judicial notice. Sexton opposed the motion with briefing, his own declaration, and the declaration of Sean Kaufman, who identified himself as a public health professional whom Sexton had retained. Sexton's attorney submitted a declaration. Apple replied.

The trial court denied Apple's motion. It held Apple satisfied anti-SLAPP's prong one: Apple was casting "an important, on-screen role," which "was ultimately an act that shaped its television show's editorial direction." The court concluded, however, that Apple failed prong two, because Apple's interest in mandatory vaccination was not "compelling" and Sexton's privacy claim thus had minimal merit. Moreover, Sexton had "submitted sufficient evidence to demonstrate a probability that he was qualified to do the role had he undergone daily testing for COVID-19."

Apple appealed the denial of its motion.

II

The anti-SLAPP statute created an efficient mechanism for the early and economical dismissal of invalid claims arising from protected activity. (*Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1159.) The procedure aims to end meritless claims at the outset. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.)

11

To this end, courts construe the statute broadly. (§425.16, subd. (a).)

Analysis of special motions to strike proceeds in two steps: the so-called prongs.

Prong one is about whether Sexton's claims arose from protected activity. They did.

Prong two placed the burden on Sexton to show his claims had at least minimal merit. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*).) Sexton's showing fell short. Apple wins.

### A

Before engaging the prongs, we grant Apple's motion for judicial notice of government public health postings during the pandemic. The fact the government posted these messages is not subject to reasonable dispute. They are relevant, not for their truth, but because Apple had access to them and could regard them as authoritative. (See, e.g., *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 807, fn. 5 (*Seelig*).) We likewise grant Apple's motion regarding news articles about *Manhunt*, which are relevant as evidence of public interest in Apple and its production, not for the truth of their statements.

### B

Apple satisfied prong one. Analysis of this prong involves two steps: we ask what public issues the challenged activity implicates, and then determine whether the challenged activity contributes to public discussion of these issues. Answering yes triggers prong two, which places the burden on plaintiffs to establish a probability of prevailing. (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1243 (*Geiser*); § 425.16, subd. (b).)

12

1

The parties disagree about the definition of the challenged activity.  (See *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884 (*Wilson*) [part of the defendant's first-step burden is identifying the activity on which the challenged claims rest].)

Apple defines the challenged activity as its casting of the role of President Andrew Johnson.  Sexton applied for the job; Apple conditionally offered it to him; Sexton refused the condition; and Apple cast someone else.  According to Apple, this set of acts was one activity: Apple rejected Sexton.

According to Sexton, however, the challenged activity was narrower: Apple refused to accommodate his health condition for merely logistical reasons, which were to avoid hardship to itself and to reduce danger to others.  Sexton says the challenged activity was Apple's withdrawal of its offer and nothing more.

The evidence supports Apple's view.  With our italics, the undisputed testimony of an Apple executive was that, after internal consultations, Apple determined its planned role required the actor playing Johnson to be "unmasked and in close proximity to other employees during hair and make-up sessions as well as during performances, so social distancing was not possible *without changing the creative requirements* of the role."

The challenged activity was not merely logistical.  It was also creative.

An executive producer testified to the same effect, again with our italics.  "Given that President Andrew Johnson's character – as well as the production's storyline in general – often focused on personal relationships, there would have been no way to implement increased safety protocols, such as social distancing

13

or masking, without impacting *the creative direction or other artistic aspects* of *Manhunt* and its storyline. . . . Forcing the production to hire Mr. Sexton, therefore, would have prohibited the creative team from telling the story that they were hired to tell."

The evidence thus dictates that the challenged activity was Apple's decision to reject Sexton and to hire someone else to play Johnson. This adverse action gave rise to Sexton's privacy and discrimination claims. The activity had both logistical and creative dimensions.

2

This challenged activity implicated two public issues. (Cf. *Geiser*, *supra*, 13 Cal.5th at p. 1249 [speech is rarely about a single issue]; *id*. at p. 1250 ["We do not see why defendants' expressive activity fits only one characterization and not both"].)

Issue one was Apple's stand in the vaccination debate. Issue two was how Apple would portray a controversial American figure. Apple's casting decision contributed to public discourse on both issues.

a

The first issue is vaccine policy. By following authoritative guidelines and expert advice about vaccination, Apple's casting decision implicated the public issue of vaccination policy.

Vaccination policy has been a public issue for as long as there have been vaccines. There can be something counterintuitive and potentially alarming about the basic vaccine idea. The free rider problem compounds the problem. The COVID-19 pandemic exacerbated both aspects of this issue.

We explain.

14

First, "the elimination of communicable diseases through vaccination became one of the greatest achievements of public health in the 20th century." (*Bruesewitz v. Wyeth* (2011) 562 U.S. 223, 226, quotation marks and citation omitted.) For example, smallpox was one of the most devastating diseases known to humanity, but a global vaccination campaign had eradicated the disease entirely by 1980. (Smallpox (undated) World Health Organization <https://www. who.int/health-topics/smallpox#tab =tab_1> [as of Mar. 27, 2025], archived at <https://perma.cc/ FAQ9-RHQZ>.)

Notwithstanding the massive public health benefits of vaccines, it can seem perverse to expose yourself to the very thing that causes illness. Is it not better completely to avoid disease instead of deliberately putting some element of it into your body?

Partly for these reasons, "public reactions to vaccines are usually quite strong, even as they have varied from awe of a seeming scientific miracle to skepticism and outright hostility." (Stern and Markel *The History Of Vaccines And Immunization: Familiar Patterns, New Challenges* (May/June 2005) 24 Health Affairs 611, 613 (*Vaccine History*).)

Controversies over vaccines have been intense and continuing. "[S]kepticism about vaccinations, and in particular their compulsory nature, has become epidemic in North America." (Johnston, *Contemporary Anti-Vaccination Movements in Historical Perspective* in The Politics of Healing: Histories of Alternative Medicine in Twentieth-Century North America, (R.D. Johnston edit., 2004) pages 244 et seq.)

A 2005 article predicted that "antivaccinationism will not fade away any time soon." (*Vaccine History* at p. 618.)

The vaccine policy debate continues to the present. (Compare Reddy, *In Rural Texas, a Measles Outbreak Hasn't Swayed Vaccine Skeptics*, Wall Street Journal (Mar. 10, 2025) with *Brown v. Smith* (2018) 24 Cal.App.5th 1135, 1140 (*Brown*) [recounting a 2014 outbreak of measles linked to Disneyland and stating "measles is one of the first diseases to reappear when vaccination coverage rates fall"].)

Accompanying this debate is the free-rider problem—a generalized social dilemma predating both vaccines and the COVID-19 pandemic. In the vaccine context, some people are particularly afraid of needles. (E.g., *Hodges v. Cedars-Sinai Medical Center* (2023) 91 Cal.App.5th 894, 899 (*Hodges*).) And it can be a bother to get the jab: it takes time and effort. Why go out of your way, especially if everyone else will get the vaccine and herd immunity will protect you? Some people condemn this behavior as morally wrong, like dodging the fare when riding the bus. Getting the free ride is, in this view, selfish conduct to be discouraged with public opprobrium. Casting opprobrium, however, creates further conflict, for few people gratefully accept public criticism. (See, e.g., Hershey et al., The Roles of Altruism, Free Riding, and Bandwagoning in Vaccination Decisions (Aug. 1994) Organizational Behavior and Human Decision Processes <https://www.sciencedirect.com/science/article/pii/S074959788471 0557> [as of Mar. 27, 2025], archived at <https://perma.cc/T4JB-GF6Z>.)

The highest courts have confronted these controversies.

In 1890, "the California Supreme Court rejected a constitutional challenge to a 'vaccination act' that required schools to exclude any child who had not been vaccinated against smallpox. (*Abeel v. Clark* (1890) 84 Cal. 226, 227–228, 230.) In

16

dismissing the suggestion that the act was 'not within the scope of a police regulation,' the court observed that, '[w]hile vaccination may not be the best and safest preventive possible, experience and observation . . . dating from the year 1796 . . . have proved it to be the best method known to medical science to lessen the liability to infection with the disease.' " (*Brown, supra,* 24 Cal.App.5th at p. 1138; see also *French v. Davidson* (1904) 143 Cal. 658, 662.)

The Supreme Court of the United States reached the same result in 1905. A city adopted a compulsory vaccination policy after a smallpox breakout in 1902. A person refused vaccination on constitutional grounds. In upholding the compulsory policy, the Supreme Court in a lengthy footnote quoted 19th century sources about the advisability of vaccines. (*Jacobson v. Massachusetts* (1905) 197 U.S. 11, 13, 31, fn. 1 [" 'It is highly desirable, in the interests of the health and lives of our countrymen, that vaccination should be rendered compulsory.'] Edwards, Vaccination (1882.)"]

Our nation's highest court returned to the topic in 1922. A city barred all unvaccinated children from school. Writing for a unanimous court, Justice Brandeis crisply dismissed the challenge. The result supported mandatory vaccination. (*Zucht v. King* (1922) 260 U.S. 174, 175–177.)

These judicial encounters with the debate have continued. Our 2018 *Brown* decision, for instance, rejected a challenge to a vaccination law. (*Brown, supra,* 24 Cal.App.5th at pp. 1143–1148.) We noted routine vaccination is one of our nation's most spectacularly effective public health initiatives, but that these gains are fragile because even a brief period when vaccination programs are disrupted can lead to deaths. (*Id.* at p. 1143.)

17

The pandemic vaccine policy debate was particularly contentious. More generally, the right response to the COVID-19 pandemic was a consuming public controversy that raised profound questions. Should every workplace and school close? When should they reopen? Under what conditions? Were the vaccines truly safe? Must I wear a mask, and what kind? How can I be sure others near me are behaving safely? And so on.

As one attorney commented to the press, "Vaccination policy is a minefield." (Roemer, *9th Circuit to rehear LA schools COVID vaccine mandate case*, Daily Journal (Feb. 5, 2025) p.1 col. 4 [quoting John W. Howard, counsel for plaintiffs in that case as well as Sexton's counsel in this case].)

Sexton himself illustrated the depth of the vaccine debate by submitting a declaration from a vigorous contemporary critic of Apple's vaccination policy.

Apple's decision to join the industry-wide agreement about vaccinations, and Apple's vaccine condition on Sexton's offer, contributed to public discussion of vaccination policy. In the face of a public debate over vaccination policy, Apple took a stand: it made vaccines mandatory on this set. Apple charted a path through the minefield and staked out a rigorous position.

Sexton incorrectly argues Apple's conduct did not address a matter of public concern because, out of regard for Sexton's interest in medical confidentiality, Apple did not publicize its specific rejection of Sexton. Apple's respect for Sexton's confidentiality did not remove the communicative content of Apple's decision. Neither did it reduce the public character of the vaccine debate. Apple took a stand *and* respected Sexton's interest in confidentiality. Respect for confidentiality diminished neither the public character of the vaccine debate nor the

18

directness of the connection between that debate and Apple's expressive conduct.

b

The second public issue is the legacy of Johnson.

When popular culture tackles factual history, it must take some stance on its topics.  There is no alternative.  Every historical account conveys messages about which people were important.  You can tell a story many ways, and how you tell it shapes the characters—inevitably.

Representations of our past can affect our attitudes about it.  Controversies over *Birth of a Nation* and *Gone With the Wind*, for instance, demonstrate that films about our past can pose potent current public issues.  (E.g., Tal, "This picture is not a work of merely local interest": *The Birth of a Nation* and *Gone with the Wind* in the Anglo-American World (Jul. 2021) Film Journal <https://journals.openedition.org/filmj/290> [as of Mar. 27, 2025], archived at <https://perma.cc/63GW-U9F7>.)

Even with no historical connection, Apple's casting decisions were pressworthy.  An industry and audience were interested in the creation of celebrities and the productions of entertainment companies.  Producers of mass entertainment hoped to engage a mass audience: a vast *public* audience.  They wanted to become the talk of the nation.  A visit to any supermarket checkout line will suggest the level of public interest in entertainment celebrities.

Apple's decision to reenact a momentous American event added a further dimension to its decisionmaking, given the specific controversy over President Andrew Johnson's historical stature.  We cite historical sources to illustrate this point.  (Cf. *McGirt v. Oklahoma* (2020) 591 U.S. 894, 904–924 [citing

19

historical works to comprehend history]; *id.* at pp. 939–940 (dis. opn. of Roberts, C.J.) [same].)

The assassination of Lincoln was cataclysmic. Lincoln led the Union to victory in the Civil War, and his Emancipation Proclamation freed millions of slaves. Then Lincoln's murder made Vice President Andrew Johnson the new leader. What would this mean for America and the hope for full liberation? Could the nation *reconstruct* itself? If so, how?

At this pivotal moment, Johnson proved a contradictory character.

On one hand, Johnson was the lone senator from a Southern state to remain with the Union during succession. Before the assassination, Johnson told a predominantly Black audience that he would be their "Moses" and would lead them through "war and bondage, to a fairer future of liberty and peace." (Levine, The Failed Promise: Reconstruction, Frederick Douglass, and the Impeachment of Andrew Johnson (2021) p. 21 (Failed Promise).)

Yet historian Eric Foner summarized Johnson as "a fervent white supremacist who opposed efforts to extend basic rights to former slaves." (Foner, He's the Worst Ever (Dec. 3, 2006) Washington Post <https://www.washingtonpost.com/wp-dyn/content/article/2006/ 12/01/AR2006120101509.html> [as of Mar. 27, 2025], archived at <https://perma.cc/F4MB-KLWK>.)

Historians wrestle with Johnson's legacy. (E.g., Foner, Reconstruction: America's Unfinished Revolution, 1863-1877 (2014 ed.) p. 177 [" 'Andrew Johnson was the queerest character that ever occupied the White House,' one contemporary remarked, and it seems safe to predict that his career as President will always remain something of an enigma"];

Trefousse, Andrew Johnson (1989) p. 13 [Johnson was an "enigma" whose reputation "has fluctuated with the passing of time"]; Gordon-Reed, Andrew Johnson (2011) p. 3 ["Throughout the entirety of his political career Andrew Johnson did everything he could to make sure blacks would never become equal citizens in the United States of America"]; *Failed Promise, supra*, p. xviii [although Andrew Johnson is "typically described as one of the worst presidents we've ever had and as an irredeemable racist," nevertheless "I begin to think we have overlooked [Johnson's] complexity"].)

What should modern film viewers make of a president who claimed to be a Moses to Black Americans but whose presidency oppressed them?  How would Apple—and the actor it selected— portray this character?  A politically ambitious bigot?  A Vice-President respected in the moment who rose to serve a war-torn nation in crisis?  A Southerner destined to subvert Lincoln's ideals?  A complex and layered combination of all of these?  A background blur without historical significance?  Or something else entirely?

Apple's casting decision would contribute to the public issue of how contemporary viewers might conceive of Johnson. The character of Johnson was to appear repeatedly in the *Manhunt* series.  By making Johnson a recurrent figure, Apple could not help but contribute to the man's current legacy.

It is immaterial that the parties have excluded the completed *Manhunt* film project from the record, for we are not concerned with how Sexton actually proposed to play the part, or what performance Apple ultimately put in the show.  *Any* portrayal of this key historical figure would affect 21st century perceptions of this man—even a rendition suggesting Johnson

21

was a forgettable nobody.  Historical omissions or denials convey their own messages.

President Johnson was not just President of the United States of America, although every President is a prototypical public figure.  Johnson was more:  a central figure in a paramount American event—Reconstruction.  Serious public debate about Johnson's stature has been continuing for over a century.  (Cf. Failed Promise, *supra*, at p. 11 ["A profile of Johnson in the 1849 *New York Sunday Times* captured the winning qualities of this emerging national figure in the Democratic party"].)

Apple thus created a *"functional* relationship" between its action and the public issue of Johnson's legacy.  (*Geiser, supra*, 13 Cal.5th at p. 1246, italics added.)  The *function* of casting Johnson was to put a live face on a dead man.  This interpretation "contributed" to the public conception of Johnson's legacy.  (*Ibid.*)

Case law supports this aspect of the trial court's ruling.

*Wilson* held that a network's decision to terminate an off-screen writer and producer named Stanley Wilson for plagiarism was conduct "in furtherance of" its speech rights.  (*Wilson, supra*, 7 Cal.5th at pp. 897, 898.)  This holding was on the "primary question" in the case.  (*Id.* at p. 881.)  In the course of this analysis, the Supreme Court noted "a television producer's decision about whom to *cast* in a program can constitute part of the message conveyed, thus meriting anti-SLAPP protection." (*Id.* at p. 896, italics added.)  This language supports our analysis.

Sexton incorrectly claims the *Wilson* opinion as support for *his* cause.  He emphasizes *Wilson*'s statement that, "as a general

22

rule, a legal challenge to a particular staffing decision will have no substantial effect on the news organization's ability to speak on public issues, which is the anti-SLAPP statute's concern." (*Wilson, supra,* 7 Cal.5th at p. 896.)  But *Wilson* immediately qualified that general rule by favorably citing *Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510, 1527, which held that the *choice of an on-air employee* to speak on behalf of a news organization furthered the organization's exercise of speech rights.  (*Wilson, supra,* 7 Cal.5th at p. 896.)  This language also supports our analysis.

Sexton attempts to distinguish *Wilson's* treatment of *Hunter* by arguing that Apple's decision was based on merely logistical, rather than creative, reasons.  This distinction is specious.  Logistically, Apple could have filmed an isolated Sexton at a distance, in an empty room or open field, without makeup, reciting conversational lines with no one near him, and then somehow edited these shots into the final show.  According to the evidence, however, that was not Apple's creative or artistic vision.  Apple aimed to tell a story focused on personal relationships and interactions.  *Logistical* arrangements and decisions were part of Apple's *creative* endeavor.  They affected how Apple chose to speak and what it had to say.

Choosing who would present a television weather report was sufficient to summon anti-SLAPP protection in *Hunter*.  (See *Hunter*, *supra*, 221 Cal.App.4th at p. 1527.)  Apple's selection of who would portray the successor to Abraham Lincoln was of at least equal dignity.

Other cases also support our analysis.

*Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143 (*Tamkin*) held the creation of a television show was an

exercise of free speech. An episode of *CSI: Crime Scene Investigation* implicated an issue of public interest "because the public was demonstrably interested in the creation and broadcasting of that episode, as shown by the posting of the casting synopses on various Web sites and the ratings for the episode." (*Ibid.*) In *Tamkin*, Justice Manella quoted Justice Chin: " '[t]he creative process must be unfettered, especially because it can often take strange turns, as many bizarre and potentially offensive ideas are suggested, tried, and, in the end, either discarded or used. . . . We must not permit juries to dissect the creative process in order to determine what was necessary to achieve the final product and what was not, and to impose liability . . . for that portion deemed unnecessary. Creativity is, by its nature, creative. It is unpredictable. Much that is not obvious can be necessary to the creative process.' " (*Id.* at pp. 144–145, quoting *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 298 (conc. opn. of Chin, J.).).

*Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027, 1036, 1039–1040, 1042 held that soliciting funds and performing work to create a film documentary about the Syrian refugee crisis qualified for anti-SLAPP protection.

In *Seelig*, a woman appeared as a contestant on a television show called *Who Wants to Marry a Multimillionaire*. After she lost, a radio talk show invited her to appear on their show. When she refused its invitation, the talk show hosts called her insulting names: "a big skank," a "local loser," and a "total chicken butt." The contestant sued the station and its hosts for defamation and other claims. The appellate court held the anti-SLAPP statute covered the radio comments about the contestant. The television show, the court ruled, had generated media debate about what its

24

advent "signified about the condition of American society. One concern focused on the sort of person willing to meet and marry a complete stranger on national television in exchange for the notoriety and financial rewards associated with the Show and the presumed millionaire lifestyle to be furnished by the groom." (*Seelig, supra,* 97 Cal.App.4th at pp. 807–808, fn. omitted.)

These precedents are not on all fours with Apple's casting decision, but they demonstrate the anti-SLAPP statute covers significant media decisions about who will perform important roles for a wide public audience. Apple's action was not some minor choice about using nails versus screws to build a set. Casting Johnson was a significant part of retelling a transforming American disaster.

This result is consistent with *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995 (*Bonni*). Hospitals worried surgeon Bonni did poor work. (*Id.* at p. 1005.) After peer review, hospitals revoked Bonni's staff privileges. Bonni sued the hospitals, claiming they were retaliating because he had raised patient safety concerns and for other reasons. The trial court granted the hospitals' anti-SLAPP motion.

The California Supreme Court reached a mixed result in *Bonni*. The anti-SLAPP statute protected some of the hospitals' actions: namely, statements made during and in connection with peer review proceedings, as well as disciplinary reports filed with official bodies. (*Id.* at p. 1004.) But the discipline hospitals imposed on Bonni was *not* protected activity. (*Ibid.*)

*Bonni* is consistent with our analysis. Most of the conduct in *Bonni* was protected, as here. The anti-SLAPP statute did not, however, protect the discipline the hospitals imposed on Bonni. The reason was the hospital defendants failed to draw any

25

connection between their discipline of Bonni and their speech rights. (*Id.* at p. 1021.) "No connection between the Hospitals' choice of which doctors should receive staff privileges and its ability to speak or petition on public issues is apparent." (*Id.* at p. 1022.) By contrast, Apple's casting decision was tightly connected to its presentation of Johnson, because the actor it chose for the role would *personify* Johnson.

Our analysis is likewise consistent with our decision in *Li v. Jenkins* (2023) 95 Cal.App.5th 493, 501, which held that a private decision to exclude a plaintiff from compensation and credit for a television show did not contribute to public discussion of the show or its themes. The defendants in *Li* did not explain how their challenged conduct itself contributed to or furthered the public discourse on the program or its themes. (*Ibid.*) By contrast, deciding who would play Johnson would contribute directly to how audiences might understand his legacy, because the actor Apple selected would strive to *become* Johnson for a new era.

In sum, Apple wins on prong one.

C

Prong two of the anti-SLAPP analysis placed the burden on Sexton to demonstrate a probability of success. Although the burden of proof is different, this procedure resembles the decision of a summary judgment motion. Courts neither weigh evidence nor resolve factual conflicts. Instead, they evaluate whether plaintiffs like Sexton have made a prima facie evidentiary showing sufficient to sustain a favorable judgment on legally valid claims. Courts accept the plaintiff's evidence and evaluate the defense showing only to determine if it defeats the plaintiff's claims as a matter of law. The suit proceeds if it has minimal

26

merit. Appellate review is independent. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

1

Sexton loses on his privacy claim because he had no reasonable expectation of privacy.

Employers retain primary responsibility for determining what measures are appropriate to ensure the safety of their employees and contractors. When these safety measures substantially infringe on a privacy interest, courts will review their reasonableness. (See *Sheehan v. San Francisco 49ers, Ltd.* (2009) 45 Cal.4th 992, 998, 1000–1003 (*Sheehan*).)

Plaintiffs must establish a reasonable expectation of privacy under the circumstances. A reasonable expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms. Customs, practices, and physical settings surrounding particular activities may create or inhibit reasonable expectations of privacy. A plaintiff's expectation of privacy in a specific context must be objectively reasonable under the circumstances, especially in light of the competing social interests involved. (*Sheehan, supra,* 45 Cal.4th at p. 1000.)

Our task is to review Apple's safety measures to see if they were "reasonable under the circumstances." (*Sheehan, supra,* 45 Cal.4th at p. 1000.) They were. A consensus of scientific opinion supported mandatory vaccination. Public health officials recommended vaccinations. Sexton's union wanted a mandatory vaccination.

Requiring vaccination for group work settings was a conventional notion when Apple adopted its policy. "[C]ompulsory immunization has long been recognized as the gold

standard for preventing the spread of contagious diseases." (*Love v. State Dept. of Education* (2018) 29 Cal.App.5th 980, 992 (*Love*).)

Private employers appropriately look to policies recommended by the federal agency responsible for limiting the spread of disease in the United States. These employers properly may use that agency's guidance in formulating their own practices. (*Hodges, supra*, 91 Cal.App.5th at pp. 911–912.)

*National safety guidelines* are a reasonable basis for employer safety policies. In a related context, during the COVID-19 pandemic, the confrontation clause permitted trial courts to follow *national safety guidelines* by requiring witnesses to wear masks. (See *People v. Alvarez* (2022) 75 Cal.App.5th 28, 35–39; *People v. Lopez* (2022) 75 Cal.App.5th 227, 232–236; *People v. Edwards* (2022) 76 Cal.App.5th 523, 526–527.)

Sexton incorrectly advocates strict scrutiny of Apple's policy.

The interest in preventing the spread of communicable diseases indeed is compelling. (*Brown, supra,* 24 Cal.App.5th at p. 1145.) The importance of this interest, however, does not mean we are to apply constitutional strict scrutiny in this statutory anti-SLAPP suit about privacy. (*Cf. City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 421 [anti-SLAPP statute is not contiguous with constitutional law].)

Supreme Court precedent rejects Sexton's embrace of strict scrutiny in this privacy context. Our Supreme Court has emphasized the need to consider "the competing social interests involved" in a particular context. (*Sheehan, supra,* 45 Cal.4th at p. 1000.) Reviewing challenged safety measures for "reasonableness" (*ibid.*) is more deferential than applying the

28

fatal-in-fact strict scrutiny standard.  (Cf. *id.* at p. 1002 ["to establish the reasonableness of their policy, the 49ers do not have to show that they have adopted the least restrictive alternative"].)

"[T]he court does not decide whether every measure is *necessary*, merely whether the policy is *reasonable*.  The state constitutional right of privacy does not grant courts a roving commission to second-guess security decisions at private entertainment events or to micromanage interactions between private parties."  (*Sheehan, supra,* 45 Cal.4th at p. 1002, italics in original.)

Sexton's demand for strict scrutiny also contradicts the *Love* decision.  (See *Love, supra,* 29 Cal.App.5th at p. 993.)

Sexton argues for a less restrictive alternative:  testing every day and keeping to himself while not shooting scenes.  Apple had reasonable grounds for rejecting Sexton's proposals about how it should film its project.  It reasonably believed testing could miss recent infections, meaning Sexton could test clean but still be spreading the disease.  Apple took a cautious approach to workplace safety, mindful of the legal and moral consequences of its decisions.

Sexton unsuccessfully relies on the declaration of one Sean Kaufman, who critiqued Apple's policy.

We summarize this declaration.

Kaufman claimed that no compelling scientific evidence showed vaccines affected the severity of illness a person suffered from COVID-19.  "Apple's policy leads me to believe that the company relied on the health officials who pushed OSHA to adopt a mandatory COVID vaccine policy for large employers . . . ."  Kaufman declared the "unvaccinated did not put vaccinated

29

people at risk." "COVID-19 does not pose a grave danger to the workforce." Kaufman's opinion was that Apple adopted its mandatory vaccination policy "reflexively" and "in response to corporate and government pressure." Apple "bowed to pressure from Hollywood."

The salient feature of this declaration is not Kaufman's disagreements with Apple's policy, which are many, but his recognition Apple was following the advice of government authorities and "Hollywood," presumably referring to its compliance with the industry-wide agreement between unions and entertainment companies. This feature supports our conclusion Apple was acting reasonably: it was following contemporary conventional wisdom about how to protect its workforce and to combat a pandemic.

In sum, Sexton's privacy claim failed because he had no reasonable expectation of privacy.

2

Sexton's discrimination claims fail because he was unqualified for the job. He could not *safely* help create the film project.

Sexton claimed Apple discriminated against a person with disabilities (1) through disparate treatment, (2) by failing to accommodate his disability, and (3) by failing to engage in an interactive process.

Sexton's "primary claim" about discrimination, according to his briefing, was for failure to accommodate his disability.

This failure-to-accommodate claim required Sexton to show he was qualified for the position he sought. (*Miller v. Dept. of Corrections & Rehabilitation* (2024) 105 Cal.App.5th 261, 278 (*Miller*); *Park v. Board of Trustees* (2017) 2 Cal.5th 1057, 1067.)

Sexton agrees, citing *Hernandez v. Rancho Santiago Community College District* (2018) 22 Cal.App.5th 1187, 1193–1194.

Sexton was not qualified to act on the *Manhunt* set. In its conditional offer, Apple identified vaccination as a job requirement. (See *Lui v. San Francisco* (2012) 211 Cal.App.4th 962, 976–977 [courts defer to employer's designation of essential duties as long as reasons for requiring employees to perform a given function are legitimate and valid].) According to authoritative public health directives, vaccination was conventional wisdom at the time. Sexton could not, or would not, get vaccinated. Sexton did not satisfy Apple's requirement for safety on the set.

Sexton disagrees, maintaining there is "no dispute" he "could perform the essential functions of this job. Apple knew that. That is why it offered him the job."

Sexton's disagreement overlooks the vaccination condition Apple placed on its offer. Sexton did not satisfy this condition. His failure-to-accommodate claim collapses.

Sexton nonetheless maintains Apple should have accommodated his refusal to get vaccinated. He agrees, however, he could not play the role of Johnson in a mask.

Rather, Sexton's central point is that he offered to test daily and to keep a social distance when not on the set. But COVID-19 tests suffered a lag, meaning that a favorable test result nonetheless might allow a disease spreader into the workplace. Acting requires close contacts with other actors, with hair and makeup artists, and with crew on the set. Based on authoritative government guidelines, Apple reasonably believed testing was no substitute for vaccination.

The record contains no evidence that testing is a feasible alternative to vaccination in this context.

Sexton points to Kaufman's declaration, which stated his disagreement with Apple's policy of mandatory vaccination. Kaufman, however, did not claim testing was as or more effective than vaccination.

Kaufman did criticize Dr. Matos, the expert Apple retained to advise it about a proper pandemic response. With our emphasis, Kaufman's criticism was as follows. "Dr. Matos' declaration contains numerous defects. For example, he does not appear to have any official training or experience with infectious diseases. *His data is also outdated or wrong, and his declaration contains many inaccurate statements.* Given that he was a paid consultant for Apple, I do not believe that Apple is using Dr. Matos' declaration for anything other than to show how it made certain decisions. Relying on a paid consultant with no expert [*sic*] in infectious diseases, much less environmental health, was itself an arbitrary decision and one reason Apple ended up with a flawed and failed vaccine policy."

We have just quoted Kaufman's one-sentence criticism: "*His data is also outdated or wrong, and his declaration contains many inaccurate statements.*"

This criticism identifies neither which data were outdated nor which statements were inaccurate. Nor did Kaufman offer a basis to support his indefinite accusations.

An expert opinion has no value if its basis is unsound, or, as here, missing entirely. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770.)

Kaufman's declaration was not evidence that testing was a reasonable accommodation to vaccination. Kaufman did not

opine that testing was a reasonable alternative to vaccination. His lengthy declaration mentions testing only three times. The first mention was his claim that Apple required only testing and not vaccinations for its corporate and retail employees. The undisputed evidence was that Apple made this distinction because these employees, unlike the *Manhunt* cast, could socially distance and mask without creating an undue health and safety risk to others. Kaufman's second mention cites a study with the primary conclusion that "The estimated population prevalence of SARS-CoV-2 antibodies in Santa Clara County implies that the infection may be much more widespread than indicated by the number of confirmed cases." (Bendavid et al., COVID-19 Antibody Seroprevalence in Santa Clara County, California (Apr. 7, 2020) Int'l. Journal of Epidemiology <https://www.medrxiv.org/content/10.1101/ 2020.04.14.20062463v2> [as of Mar. 27, 2025], archived at <https://perma.cc/NQ2Z-894T>.) This conclusion supports Apple, not Sexton. Kaufman's third mention is to the same effect: "Neutralizing antibodies, antibodies that bind to the virus and prevent infection, cannot be measured with a point of care test." Explaining the weaknesses of testing does not establish testing as a viable alternative to vaccination as a means of protecting workplace health and safety.

Sexton claimed other companies had hired him in an unvaccinated state. Apple's competitors could not set a legal standard for Apple. Sexton offers no precedent for this faulty argument.

Sexton protests the lack of a "full evidentiary record." Apple rightly explains that the purpose of the anti-SLAPP statute is to prevent SLAPPs by ending them early and without great cost to the SLAPP target. (*Equilon Enterprises v.*

*Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 65.)  The statute provides a procedure for discovery, *id.* at p. 66, which Sexton forfeited.

In sum, Sexton offers no evidence that testing could be a reasonable accommodation for the position he sought.  Neither can he point to a precedent approving an accommodation that would increase a potentially deadly threat to coworkers.  This claim fails.

Sexton's next claim was for *failure to engage in the interactive process*.   This claim also required him to show he was qualified for the job.  (E.g., *Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 365, 375–380 [claims for failure to accommodate and for failure to engage in the interactive process cannot succeed if plaintiffs are unqualified for the job].)  Sexton was unqualified, so this claim lacks merit.

Additionally and independently, the employee must identify a reasonable accommodation that would have been available had the parties engaged in the interactive process.  (*Miller, supra,* 105 Cal.App.5th at pp. 282–283, 284.)  As discussed, this record offers no support for the notion that, in this context, testing was a reasonable accommodation to a policy of mandatory vaccination.

A third problem is that Apple *did* engage in the interactive process.  The undisputed evidence was that Apple did consider Sexton's request for an exemption.  Apple determined no accommodation was feasible.  Sexton on appeal has pointed to no evidence that testing was a reasonable accommodation here.  Rather, Sexton's position boils down to his claim that he had a right to impose a potentially deadly risk on coworkers so he could act in *Manhunt*.  No precedent supports this claim.

Sexton based his third discrimination claim on a theory of disparate treatment: that Apple discriminated against him because of his disability. This theory required Sexton to show he was qualified for the job. (*Guz v. Bechtel Nat., Inc.* (2000) 24 Cal.4th 317, 355.) Sexton was unqualified, as discussed.

In short, Sexton failed prong two. His suit lacked merit.

3

Apple seeks fees and costs under section 425.16(c)(1). Sexton refused to respond to this point and thereby concedes it.

DISPOSITION

We reverse the order and award costs to appellants and grant Apple's request for judicial notice. We remand for entry of judgment for Apple and for a trial court determination of the sums Sexton owes Apple for fees and costs.


WILEY, J.


We concur:


GRIMES, Acting P. J.


VIRAMONTES, J.